THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HENRY LYNOM, Defendant-Appellant.

First District (2nd Division)    No. 80-741

Opinion filed June 30, 1981.—Rehearing denied July 23, 1981.

1114

Ralph Ruebner, of State Appellate Defender's Office, of Chicago, and Gerald Block, of Bannister, Block & Spevack, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Barry A. Gross, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant was charged by information with murder and armed violence in connection with the death of Hattie Gary (also known as Hattie Adams), the woman he lived with. He was convicted in a bench trial of voluntary manslaughter and armed violence and was given concurrent 6-year sentences. The issues presented for review are whether: a prima facie showing of self-defense was made by defendant which the State failed to rebut; defendant was armed with a dangerous weapon so as to support his conviction of armed violence; defendant's conviction of voluntary manslaughter is a lesser-included offense of armed violence because both offenses arose under the same transaction; and, the legislature exceeded its constitutional power to prescribe penalties in designating defendant's conduct a Class X felony. For the reasons set forth below, we affirm.

The State presented the following case at trial. Mildred Boyrd testified that she had been living temporarily with the victim, Hattie Gary, and defendant at 5700 S. La Salle Street, Chicago. In their apartment on December 6, 1978, at approximately 3:30 p.m., she saw the victim place a handgun in a purple purse. At about 4:30 p.m., she observed defendant and the victim arguing in the dining room over this gun. Defendant was holding the gun and said to the victim, "If I ever get my hands on that gun, bitch, I told you I was going to kill you and throw it over the Dan Ryan" Expressway. The victim asked defendant to give the gun back to her because it was the only protection she had, but he refused. Boyrd then asked defendant for the gun and he responded that he would think about it. The argument lasted a couple of minutes, after which the victim went

into the bedroom and defendant went into the kitchen. One-half hour later, defendant walked out of the kitchen and into the victim's bedroom carrying the gun. Boyrd, who was sitting in the living room, then heard a shot and immediately thereafter saw defendant emerge from the bedroom door carrying the pistol. After defendant left the house, Boyrd went into the bedroom and saw blood on the victim's chest. Boyrd then ran to a neighbor's house and called the police. On cross-examination, Boyrd testified that earlier that day, she and the victim drank several cups of gin. She described the argument between defendant and victim as having been of 20 minutes duration. Defendant walked into the bedroom about 20 minutes after the argument. She heard no voices and couple of seconds later, she heard a gunshot. On redirect, she testified that she had no watch and was uncertain as to the times at which the events took place.

Chicago police officer Donald Mills testified that at 7 p.m. on December 6, 1978, after receiving a radio dispatch of a shooting at 5700 S. La Salle St., he proceeded to that location where he found the deceased victim in the bedroom. He searched the apartment for weapons but found none. Later that evening, while on patrol, he received a radio dispatch that defendant could be found at a tavern several blocks from the apartment. He proceeded there and placed defendant under arrest.

Dr. Lee F. Beamer, an assistant Cook County medical examiner, testified that his autopsy of the victim indicated the cause of death to have been a projectile wound from a bullet which entered her chest and struck her heart. The entry wound exhibited no evidence of surrounding smoke or powder "strippling." He defined "strippling" as a type of burn which occurs to the skin if particles of powder come out of the gun barrel and strike the skin while the particles are still burning. For strippling to be found on the skin would require the gun to have been fired within close range, roughly 18 to 22 inches, of the body. On cross-examination, Dr. Beamer testified that tests performed indicated alcohol in the victim's blood and that she possibly was intoxicated. Strippling may not occur even when the gun is fired within close range if the particles are screened out by an intermediate object, such as clothing. Although the victim was wearing a nightgown and a blouse when he performed the autopsy, he did not recall if they exhibited bullet holes.

Mary Shropshire, an assistant state's attorney, testified that on the day of this shooting she was assigned to the Felony Review Unit. Before interviewing defendant on the night of his arrest, she informed him that she was an assistant state's attorney, then advised him of his *Miranda* rights. Defendant agreed to waive those rights and speak with her. He stated that while he was sitting at a table in the apartment, the victim came out of the bedroom with a gun and said she was going to shoot him. He stood up and began struggling for the gun. During the struggle, the

gun discharged while the victim's finger was on the trigger. Shropshire then asked if it was possible that he had taken the gun away and then discharged it, to which he responded that it was perhaps possible but his memory was hazy. The State then rested.

When the trial resumed the next day, defendant read a stipulation into the record that if Chicago police officers T. C. Davies and Gene Murphy were called as witnesses, they would testify that when they viewed the victim that day at her apartment, she was wearing a nightgown and blouse exhibiting a bullet hole corresponding to the location the bullet entered her body. Tommy Lynom, defendant's brother, then testified after appropriate foundation that the victim had a reputation in the community for becoming violent when she consumed alcoholic beverages.

Defendant testified that he had lived with the victim for five years before her death and considered her to be his "common law" wife. Mildred Boyrd and her infant son were living with them during December of 1978 because their apartment had no heat. At about 6 p.m. on December 6, 1978, he and Boyrd's older son, Charles, were drinking beer in the apartment and the victim was lying down in the bedroom. Defendant later walked into the bedroom and saw the victim standing by the closet holding a gun, which she pointed at him. When defendant turned to walk out of the bedroom, she cocked the gun and walked up to him. Defendant turned, grabbed her hand, and as he began to struggle with her, the gun went off. The struggle lasted only a couple of seconds. Defendant came out of the bedroom and told Boyrd that the victim had been playing with the gun and "I went [in] and she got shot." He told Boyrd to call the police while he looked for a policeman on the street. Unable to find a policeman, he stopped in a tavern to phone the police station. He then called his apartment and was told that the police had already arrived there, so he told them of his location. The police came to the tavern and arrested him. At the police station, he tried to explain what happened but "they didn't let me explain." On cross-examination, defendant testified that when he tried to explain to Shropshire what happened, she said he was lying.

The trial court found defendant not guilty of murder, but guilty of voluntary manslaughter and armed violence.

■■ Defendant contends that the evidence submitted in his behalf was a prima facie showing that he acted in self-defense when he shot the victim which was not disproven by the State beyond a reasonable doubt, requiring reversal. The basis for defendant's argument is that his testimony of the struggle with the victim over the handgun was not contradicted and his self-defense theory was not disproved. He argues that under section 3—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979,

ch. 38, par. 3—2(b)), once he presented some evidence of self-defense, the State was required to sustain the burden of proving that he was guilty beyond a reasonable doubt as to that issue, together with all the other elements of the offense. When a defendant is the only witness to the events under consideration and his testimony allegedly constitutes the only evidence of what actually took place, the trier of fact is not obligated to accept all, or even any part, of his statements but may consider the reasonableness of the defense offered, assess its improbabilities, if any, and reject that evidence which it finds contradictory, unlikely, or improbable in light of other facts before it. (*People v. Wesley* (1978), 65 Ill. App. 3d 25, 31-32, 382 N.E.2d 358, *cert. denied* (1979), 74 Ill. 2d 589; *People v. Sykes* (1977), 45 Ill. App. 3d 674, 679-80, 359 N.E.2d 897.) Defendant's version of how the shooting took place was controverted by the circumstances of the events both before and after the shooting. The trial court had the right to believe Boyrd's testimony that defendant had maintained possession of the gun from the time he first took it to the time he left the apartment after the shooting. This conclusion could have been considered supported by the absence of the weapon when the victim's apartment was searched by Officer Mills. The successful termination by defendant of the alleged struggle with the victim could have appeared improbable to the trial court, since the victim weighed 178 pounds and defendant only 120 pounds at the time. Further, although the action was alleged to have taken place at close range, the absence of strippling or gunpowder wounds could have been considered by the trial court as having supported the theory that he was further removed from the victim than the arm's length defendant insists that it was. The trial court had the right to disbelieve his testimony that no argument between himself and the victim took place, in the face of Boyrd's repeated insistence that there had been such an argument over the handgun and the defendant threatened to kill the victim. We cannot say that these circumstances could not justify the trial court's rejection of defendant's version of events.

■■ Defendant's reliance upon *People v. Reeves* (1977), 47 Ill. App. 3d 406, 362 N.E.2d 9, and *People v. Goodman* (1979), 77 Ill. App. 3d 569, 396 N.E.2d 274, is without foundation. In *Reeves*, witnesses testified that the victim had placed defendant in a headlock as he struck her, notwithstanding the State's theory that defendant sustained no bruises. In *Goodman* the claim of self-defense was corroborated by physical evidence that defendant had been beaten by the victim and the shooting occurred after a struggle, together with the identification of powder burns on the victim's body consistent with the theory that the gun was fired at close range. Defendant's attempt to discredit Boyrd's testimony in the case at bar, because she had been drinking with the victim during the day and was ambiguous about the times at which certain events took

place, was a matter for the trial court in its determination of the credibility of witnesses and the weight to be given to their testimony. We are not authorized to set aside that determination unless the proof is so unsatisfactory as to cause a reasonable doubt of guilt to appear. (*People v. Lofton* (1977), 69 Ill. 2d 67, 72-73, 370 N.E.2d 517.) We do not find the proof so unsatisfactory.

The defense advanced the theory of voluntary manslaughter in the trial court in its argument that the State had failed to sustain its burden on the charge of murder but that, at best, a case of voluntary manslaughter had been made out. Defense counsel reviewed the evidence for the court and made the following statement:

"I believe at best, Your Honor, *the State's evidence shows a case of voluntary manslaughter* and that *there was a serious argument* between Hattie and Mr. Lynom, *that this argument escalated to the point of seriousness* on behalf of Mr. Lynom, and perhaps there was a struggle over a gun, *and that Hattie Gary was killed as a result of that struggle and argument.*" (Emphasis supplied.)

Defense counsel then recounted defendant's version of the shooting events, including the victim's state of intoxication, her possession of a gun pointing at him, their struggle over the gun, and the discharge striking the victim. Further argument was then made by defense counsel:

"I believe, Your Honor, that at worst Mr. Lynom's story indicated, *his testimony indicates a case of voluntary manslaughter*. At worst that he recklessly handled the situation in trying to disarm Miss Gary." (Emphasis supplied.)

Counsel then went on to repeat defendant's version and what he saw as corroborated in Shropshire's testimony, and asked the court to return a finding of not guilty. In the State's argument, the assistant state's attorney maintained that the proof supported the charge of murder and that there was no basis for a finding of voluntary manslaughter. The trial court found that defendant had been "\* \* \* acting under a sudden and intense passion resulting from serious provocation from Hattie Gary, shot and killed Hattie Gary with a handgun without lawful justification, \* \* \*" and entered a finding of guilty. The question arises as to whether defendant can complain on appeal of error which he has caused or actively invited below.

In *People v. Curwick* (1975), 33 Ill. App. 3d 757, 759-60, 338 N.E.2d 468, defendant was indicted and tried for having murdered the woman with whom he had been living after separating from his wife. The case was submitted to the jury upon the theories of murder and voluntary manslaughter, the latter at the request of the defense. Defense counsel argued, over objection by the State, that there was evidence from which the jury could conclude that defendant shot the victim in a fit of passion

provoked by the sudden discovery of her relationship with another man. The jury was given defendant's proposed instruction on the crime of voluntary manslaughter and returned a verdict thereon. Defendant's appeal was based, in part, upon the alleged absence of evidence to show either a "sudden" or an "intense" passion or "serious provocation" as required by statute. In affirming defendant's conviction, the court stated:

> "A defendant * * * should not be allowed at the trial level to argue that the jury should be instructed that it could find him guilty of voluntary manslaughter, and thus have that lesser offense before the jury, and then, on appeal (after benefitting from the instruction and argument) assert that the evidence could not support a voluntary manslaughter conviction. * * *
>
> He could not * * * argue that a 'sudden and intense passion resulting from serious provocation,' which distinguishes murder from voluntary manslaughter by reason of passion, was not shown by the evidence, after he had successfully taken the opposite position in the trial court, and, therefore, was responsible for having put the voluntary manslaughter issue before the jury in the first instance."

In *People v. Robertson* (1975), 34 Ill. App. 3d 762, 764, 340 N.E.2d 213, defendant was indicted and tried for the murder of a woman with whom he previously had been living. After a jury trial, he was found guilty of voluntary manslaughter. Defendant requested instructions on the voluntary manslaughter charge which required the State to prove that defendant acted under a sudden and intense passion resulting from previous provocation by the victim and argued during the trial that if the jury did not decide to acquit defendant, evidence of provocation was sufficient to reduce the crime from murder to voluntary manslaughter, an argument to which the State objected. The court gave defendant's voluntary manslaughter instructions to the jury which found him guilty of that charge. On appeal defendant contended that the evidence of provocation by the victim was inadequate to support the voluntary manslaughter verdict. Relying upon *People v. Curwick*, the court held that a defendant found guilty of voluntary manslaughter may not contest the sufficiency of the evidence of that charge after he requested such an instruction and submission of that issue to the fact-finder.

■■ In the instant case, the trial court was urged by the defense to consider the State's evidence as indicating a case of voluntary manslaughter, interpreting the testimony of the witnesses as showing an argument between defendant and victim which "escalated to the point of seriousness" that resulted in the struggle and shooting, an argument iterated later in the summation. The trial court so found, and our examination of the record reveals that such a conclusion can be sustained

beyond a reasonable doubt. Further, having successfully persuaded the trial court to find "at best" or "at worst" a case of voluntary manslaughter, defendant cannot now reverse his view of the evidence and predicate his appeal upon the very result he sought and actively invited at the trial level. (*People v. Riley* (1964), 31 Ill. 2d 490, 496, 202 N.E.2d 531; *People v. Hamelin* (1979), 75 Ill. App. 3d 445, 448, 394 N.E.2d 566; *People v. Curwick; People v. Robertson; People v. Benford* (1975), 31 Ill. App. 3d 892, 896, 335 N.E.2d 106.) Accordingly, we affirm defendant's conviction of voluntary manslaughter.

■■ Defendant next asserts that he was neither carrying nor armed with a dangerous weapon at the time of the shooting because the victim was shot during a struggle for control of the weapon, which, he claims, was initially in the victim's possession. Therefore, he urges, he could not have been "armed with a dangerous weapon" under the armed violence statute (Ill. Rev. Stat. 1979, ch. 38, par. 33A—1(a)) and his conviction thereunder must be reversed. The State points to countervailing evidence which revealed that defendant was seen by Boyrd taking the gun away from the victim earlier in the afternoon, refusing to return it to her or turn it over to the witness and, after the shooting, emerging from the bedroom with the gun in his hand, all of which demonstrated that defendant was indeed "armed with a dangerous weapon" in contemplation of the statute. The trier of fact had the right to believe the latter version of events and the conviction, therefore, cannot be disturbed. *People v. Lofton.*

Defendant assigns error in the trial court convictions for the offenses of voluntary manslaughter and armed violence, insisting that the former was a lesser-included offense of the latter. Among the cases relied upon by defendant in support of his position are the seminal case of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, and the more recent case of *People v. Myers* (1980), 83 Ill. App. 3d 1073, 404 N.E.2d 1082. On June 4, 1981, the supreme court rendered its decision in the *Myers* case and reversed that portion of the appellate court decision which vacated the conviction and sentence for attempted murder and affirmed the convictions for armed violence, armed robbery and aggravated kidnapping. (*People v. Myers* (1981), 85 Ill. 2d 281.) In doing so, the supreme court explained that under the rule it had promulgated in *King*, "[a]s long as there are multiple acts * * * their interrelationship does not preclude multiple convictions and the imposition of concurrent sentences based upon them." *People v. Myers* (1981), 85 Ill. 2d 281, 288.

On that same day, June 4, 1981, the supreme court also decided *People v. Haron* (1981), 85 Ill. 2d 261, in which the armed violence statute was again considered. There, one defendant, Haron, was charged by information with one count of armed violence, two counts of aggravated battery, and one count of unlawful use of weapon. The other defendant in

the consolidated case, Kehm, was charged by information with one count of illegal delivery of cannabis and one count of armed violence. After reviewing authorities in other jurisdictions, the supreme court concluded as to Haron that the armed violence statute could not be applied to an act which, if committed unarmed, would be a misdemeanor, so that the offense would be raised to the level of a felony, since Haron was already charged with battery which became aggravated by virtue of the use of a weapon. Thus, the enhancement of the offense of battery to that of aggravated battery was already based upon the use of a deadly weapon. In applying the policy of lenity, the supreme court denied application of the armed violence statute provisions to a charge of assault with a deadly weapon. In doing so, the supreme court distinguished that situation from one in which the offense charged was a felony and could be committed without the use of a deadly weapon, stating:

"Our review of the language of the statute and the authorities leads us to conclude that the General Assembly did not intend that the presence of a weapon serve to enhance an offense from misdemeanor to felony and also to serve as the basis for a charge of armed violence. In our opinion *the requirement of section 33A—2 that there be the commission of a felony while armed with a dangerous weapon contemplates the commission of a predicate offense which is a felony without enhancement by the presence of a weapon.*" (Emphasis supplied.) 85 Ill. 2d 261, 278.

■■■ From the foregoing cases, then, *People v. Myers* and *People v. Haron*, it appears that if the predicate offense is a felony by statutory definition when committed *without* possession or use of a dangerous weapon, such an offense may support a second charge, armed violence, when committed *with* possession or use of such a weapon. (*Haron,* as applied to Kehm.) In the instant case, the charge of voluntary manslaughter requires that defendant be shown to have killed his victim while acting under a sudden and intense passion or that he harbored an unreasonable belief that the killing was legally justified. (Ill. Rev. Stat. 1979, ch. 38, par. 9—2.) Clearly, defendant need not have been armed with a dangerous weapon at the time of the commission of such an act,[1] in order to have been found guilty of this predicate offense. Therefore, when defendant here utilized a handgun in the commission of this felony, his act became amenable to the provisions of the armed violence statute (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2), and his conviction and sentences for both offenses must be affirmed.

Lastly, defendant maintains that his conviction for armed violence

---

[1] We need not provide a laundry list of instances and examples in which voluntary manslaughter may be committed without the use of a deadly weapon.

was based upon the act of voluntary manslaughter and must be reversed because the Legislature exceeded constitutional limitations on its power to prescribe penalties for offenses when it made defendant's conduct a Class X felony. This is so, he claims, because the violation of the statute while armed with a category I weapon results in a mandatory term of incarceration of not less than 6 nor more than 30 years and is nonprobational (Ill. Rev. Stat. 1979, ch. 38, pars. 33A—3(a), 1005—5—3(c)(2)(C), and 1005—8—1(a)(3)), which does not reasonably relate to the seriousness of the offense of voluntary manslaughter and other offenses encompassed thereunder, is a penalty which should "shock the conscience of the court," and is disproportionate when compared to other penalties imposed for crimes arising under similar circumstances.

■■ The supreme court in *People v. Haron* was confronted with a similar constitutional challenge to the armed violence statute and, although declining to reach the question in view of the posture of that case, made reference to its holding in *People v. Bradley* (1980), 79 Ill. 2d 410, 417, 403 N.E.2d 1029. *Bradley* recognized the general rule that the legislature has wide discretion to prescribe penalties for defined offenses, subject to due process considerations of whether the statute in question is reasonably designed to remedy the evils determined to be a threat to the public health, safety and general welfare. Utilizing that general rule, the court in *People v. Lenhart* (1980), 90 Ill. App. 3d 502, 413 N.E.2d 220, found the penalty provisions and effects thereof to be constitutional in the face of an attack quite similar to that presented in the instant case. In *Lenhart*, the constitutionality of the armed violence statute was upheld upon the basis of danger to victims, among others, posed by armed felons. In the case *sub judice*, the danger to the victim was final, irretrievable, and tragic— her death, a result far more serious than the predicate offense in *Lenhart*, which was criminal trespass to property. We find no reason to depart from the conclusion reached in *Lenhart* and find that the subject penalty provisions are commensurate with the evils to be remedied by the statute, are not "shocking to the conscience of the court" and are not disproportionate for other crimes. For the reasons aforesaid, defendant's attack upon the constitutionality of the armed violence statute cannot be sustained.

For the reasons stated above, we decline to disturb either defendant's convictions of voluntary manslaughter and armed violence, or the penalties imposed by the trial court and, accordingly, must affirm.

Affirmed.

STAMOS and DOWNING, JJ., concur.