THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DEAN JOHNSON, Defendant-Appellant.

First District (3rd Division)    No. 79-2407

Opinion filed November 18, 1981.

Ralph Ruebner and Susan Bandes, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:
Following a bench trial the defendant, Dean Johnson, was found guilty of the murder of Patricia Baldwin (Patty) and the attempt murder of Steven Bush (Steven). The defendant was also found guilty of two counts of aggravated battery and one count of armed violence in that while armed with a dangerous weapon he committed the offense of aggravated battery. The defendant was sentenced to a term of 20 years for murder, a term of 10 years for attempt murder, and a term of 10 years for armed violence. All sentences were to run concurrently.

On appeal, the defendant contends that the State failed to prove

beyond a reasonable doubt that he was sane at the time he committed the offenses. He also asserts that the court erred in sentencing him for both attempt murder and armed violence since both convictions arose from the same act.

The evidence presented at trial revealed that the defendant, Patty and Steven suffered from hearing impairments and were students at William R. Harper College in Palatine, Illinois. The three students had attended the same high school in Hinsdale where they were enrolled in the hearing impairment program.

During 1978 the defendant and Patty attended several social affairs together. At a party in November Patty and the defendant argued. Thereafter Patty refused to speak to the defendant.

Subsequently Patty began to date Steven. In February 1979 an incident occurred near the college cafeteria when the defendant attempted to discuss with Patty the reason she refused to go out with him. According to Steven, the defendant followed the couple to the campus parking lot where he slapped Patty's face. The defendant then followed Steven and Patty as they drove home and attempted to force Steven's automobile off the road. Steven stopped at a gas station to call the police. The defendant pounded on the car window and threatened to kill the couple if they told their parents about the incident.

Charlene Dwyer, the college's counselor for the hearing impaired program, spoke to the defendant concerning this incident. The defendant claimed that he became upset because Patty and Steven were talking about him in the cafeteria. The defendant admitted that he "blew up," but stated that the incident was now forgotten. Following a student conduct hearing the defendant was told not to contact Patty or he would be dismissed from school.

On March 1, 1979, Steven drove Patty to school and parked his automobile in the campus parking lot. As they got out of the car, Steven saw the defendant walk toward them. The defendant struck Patty in the face with his hand. When Steven tried to intervene, the defendant stabbed him in the neck with a knife. Steven fell, and the defendant stabbed Patty 14 times. When a campus nurse arrived at the scene, Patty had no pulse or respiration.

The defendant fled and was arrested that evening in a cemetery.

Dr. Eugene Mindel, a psychiatrist who specializes in working with the handicapped, testified concerning his examination of the defendant. The defendant told Dr. Mindel that he became very upset whenever Patty refused to speak with him. He began to have bad dreams about Patty which progessively caused him to become more disturbed. On the evening before Patty's death, the defendant went to the computer room at the college. However, images from his dreams prevented him from work-

ing. The defendant told Dr. Mindel that on March 1, 1979, he went to Lee & Eddie's Catering where he had worked for several years. The defendant took a nap and dreamed that Patty was a monster. When he left work, the defendant took a knife and placed it in his car's trunk. The defendant drove to the college, took out the knife and placed it in his belt. When he saw Steven and Patty, the defendant yelled "I have bad dreams" and stabbed Patty. The defendant only remembered one small cut on Patty. After the stabbing, the defendant wanted to kill himself. He drove his car very fast in an attempt to have a fatal crash. He stole and took some aspirins which made him dizzy. The defendant tore at the interior of his car before abandoning it in a snowbank. The following morning in jail the defendant attempted to cut his wrists on the bolts of a toilet bowl.

Dr. Mindel believed that at the time of the stabbing the defendant suffered from a dissociative reaction, a state in which certain functions of the personality escape the individual's control. The defendant was under extreme stress, exhausted from bad dreams, and had no rational control over his behavior. Dr. Mindel concluded that the defendant was unable to conform his conduct to the requirements of the law and was unable to appreciate the criminality of his acts. It was Dr. Mindel's opinion that the fact that the defendant recalled only one small cut on Patty indicated that the defendant was in a psychotic frenzy when the stabbing occurred and that he had lost control over his rational process.

Barbara Rayson, a clinical psychologist who works with the hearing impaired, tested the defendant at the request of Dr. Mindel. In her opinion the defendant had a borderline personality, a fragile organization of the personality which under extreme stress can become, for a short time, psychotic.

Dr. Melvin Seglin, a psychiatrist, examined the defendant one week after the murder. He found the defendant incoherent and concluded that at the time of the murder the defendant could not conform his conduct to the law and lacked substantial appreciation for what he was doing. Dr. Seglin believed that the defendant had an obsessive-compulsive neurosis which became a schizophrenic psychosis. As a result of the psychosis, the defendant was under the control of unconscious forces in his mind and had lost his ability to control these unconscious forces.

The State presented expert witnesses to rebut the defendant's claim of insanity. Dr. Gershon Kaplan, a psychiatrist employed at the psychiatric institute of the circuit court of Cook County, examined the defendant and concluded that although the defendant had a personality disorder, there was no evidence of psychosis. The defendant had a passive-aggressive personality in that he had difficulty handling anger. Dr. Kaplan felt that at the time of the stabbings the defendant could conform his conduct to the law and was able to appreciate the criminality of his acts.

He found it significant that the defendant could recall clearly and completely his actions before and after the stabbings.

Michael Rabin, a clinical psychologist at the psychiatric institute, examined the defendant and had him perform several tests. Rabin found that the defendant had a passive-aggressive personality and that there was no evidence of psychosis.

Dr. Werner Tuteur, a psychiatrist associated with Elgin Mental Health Center, examined the defendant. He also concluded that at the time of the stabbings the defendant had no mental disease which would have deprived him of his ability to conform his conduct to the requirements of the law.

Autis Price and Thomas Kolessar worked with the defendant on the morning of March 1 at Lee & Eddie's Catering. Neither man observed anything unusual about the defendant's behavior.

At the conclusion of all the evidence, the trial court found that the defendant was sane when he committed the acts and guilty of all the offenses charged in the indictment.

The defendant first contends that the State failed to prove beyond a reasonable doubt that he was sane at the time he committed the offenses. A person is not criminally responsible for his conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Ill. Rev. Stat. 1977, ch. 38, par. 6—2(a).

While the law presumes all individuals to be sane, once the defendant introduces sufficient evidence to raise a reasonable doubt of his sanity, the burden shifts to the State to prove beyond a reasonable doubt that the defendant was legally sane at the time the offense was committed. (*People v. Martin* (1980), 87 Ill. App. 3d 77, 409 N.E.2d 114.) In ascertaining the defendant's sanity the trier of fact must consider the totality of the evidence. In so doing, the trier of fact is entitled to weigh the testimony and to determine the credibility of witnesses, both lay and expert, without being required by law to accept the opinions of psychiatrists. (*People v. Sims* (1976), 35 Ill. App. 3d 401, 342 N.E.2d 256.) The determination of the credibility of witnesses and the weight to be given to their testimony are functions of the trier of fact. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) A finding of sanity will not be disturbed unless it is so palpably erroneous as to indicate that it was based upon prejudice or passion. *People v. Rennert* (1977), 49 Ill. App. 3d 485, 364 N.E.2d 506.

■■ In the instant case there was conflicting expert testimony concerning the issue of whether the defendant was criminally responsible for his actions. The defendant argues that the testimony of the State's expert witnesses was discredited in several ways. He points out that these experts

were not trained to work with the deaf; that their examinations of the defendant were not as extensive as those of the defendant's experts; that Rabin, the clinical psychologist, did not administer several of the tests which Rayson did; and that Dr. Tuteur was impeached. These factors, however, concern the credibility of the witnesses, an issue to be determined by the trier of fact. The record reveals that the trial court heard extensive testimony, which this opinion has summarized, concerning the witnesses' qualifications, their interviews with the defendant, the bases of their opinions, and their criticism of the contrary theories concerning the defendant's mental state. After carefully evaluating the totality of the evidence, the trial court concluded that the State had proved beyond a reasonable doubt that the defendant was sane. We cannot say that this conclusion was so palpably erroneous as to require reversal.

■■ The defendant also argues that the trial court considered matters not in evidence in finding the defendant sane. We have reviewed the extensive findings of fact set forth by the court and conclude that these findings were based on evidence or were reasonable conclusions derived from the evidence presented at trial.

The defendant's second argument is that he was improperly sentenced for both attempt murder and armed violence since both convictions arose from the same act. Multiple convictions cannot stand when they are carved from the same physical act. *People v. Myers* (1981), 85 Ill. 2d 281, 422 N.E.2d 620; *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 181, 98 S. Ct. 273.

● 3 In the instant case the charge of attempt murder arose from defendant's act of stabbing Steven in the neck. That same single physical act was the basis of the armed violence charge which stated "while armed with a dangerous weapon, to wit: a stabbing instrument (he) committed the offense of aggravated battery." Thus, both convictions cannot stand.

The State refers us to recent decisions of the second division of this court which held that multiple convictions are proper for armed violence and the underlying offense when the latter may be committed without possession of a dangerous weapon. (*People v. Feierabend* (1981), 98 Ill. App. 3d 731, 424 N.E.2d 765; *People v. Lynom* (1981), 97 Ill. App. 3d 1113, 423 N.E.2d 1281; *People v. Best* (1981), 97 Ill. App. 3d 1083, 424 N.E.2d 29.) The court relied on two recent supreme court decisions in reaching this conclusion, *People v. Myers* and *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627. We have carefully examined both opinions and must respectfully disagree with the second division's interpretation of these cases. We do not believe that either opinion modifies in any way the holding of *People v. King*. We, therefore, vacate defendant's conviction and sentence for armed violence.

Accordingly, the judgments of the circuit court of Cook County for

murder and attempt murder are hereby affirmed; the judgment for armed violence is vacated.

Affirmed in part, and vacated in part.

RIZZI, P. J., and McNAMARA, J., concur.