THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DARNELL PAYNE *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 80-973

Opinion filed December 22, 1981.

952

DOWNING, J., concurring in part and dissenting in part.

James J. Doherty, Public Defender, of Chicago (Karen A. Popek and Ronald P. Alwin, Assistant Public Defenders, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard F. Burke, and Barry A. Gross, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendants Darnell Payne and Larry Bailey guilty of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2), armed violence (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2) and burglary (Ill. Rev. Stat. 1977, ch. 38, par. 19—1). Payne was sentenced to concurrent terms of 24 years, respectively, for the offenses of armed robbery and armed violence and 7 years for burglary. Bailey was sentenced to concurrent terms of 18 years, respectively, for the offenses of armed robbery and armed violence and 7 years for burglary.

The issues raised on appeal include whether: (1) defendants' arrests were illegal; (2) the lineup and in-court identifications of defendants were tainted by defendants' illegal arrests; (3) a handgun previously ruled inadmissible on defendants' motion to suppress should have been received in evidence; (4) defendants were proven guilty of the charges beyond a reasonable doubt; (5) defendants' convictions for armed violence should be reversed; and (6) burglary is a lesser included offense of armed violence. For the reasons which follow, we affirm in part and reverse in part.

At the pretrial hearing on defendants' motion to suppress, Chicago Police Officer J. Benigno testified that at about 9:30 a.m. on November 8, 1978, he was assigned to investigate the armed robbery that had just occurred at the victim's apartment on North Lamon Avenue in Chicago. There he interviewed, among others, the victim, the building janitor, Claud Pearce, and his son, with respect to the robbery in general and the physical characteristics of the offenders in particular. Officer Benigno

spoke briefly with the victim's husband, who had to return to work, but stated that he would return later.

The victim's husband later returned with a companion who told Benigno that he knew who had "shoved [the victim's] door in and brandished the weapons [and] where they were likely to be." The informant gave Benigno his name but requested that he remain anonymous because he knew the offenders and feared for his life. He told Benigno that defendants committed the burglary; that they were in the company of a black female named Brenda who had knocked on the victim's door; and that the offenders would likely be found at an address either on West Quincy or Monroe Streets. The informant gave a physical description of defendants which matched the ones Benigno had received earlier from the witnesses and victim. The informant never stated where he received the information concerning the identity of the burglars. Benigno "got the distinct impression that he knew them [sic] almost as if he heard it from them." He did not check the informant's address, whether he had a record for violations, whether the informant had spoken with the victim's husband about the incident, and never saw the man before or since the day of the burglary.

After his conversation with the informant, Officer Benigno and his partner proceeded to the West Monroe Street address where they found one Brenda Johnson. She told them that defendants Bailey and Payne had asked her to buy some drugs at the victim's apartment. All she had to do was knock on the door and announce her name, which she did. Defendants then pushed her aside and wielded weapons at which time she became frightened and fled. She was not charged with an offense. Benigno was not present when defendants were arrested.

Also during defendants' motion to suppress, Chicago Police Officer B. Munkvold testified that he met with Officer Benigno at approximately 4 p.m. on November 8, 1978. Benigno had information as to the identity of the offenders in the armed robbery and their addresses. Pursuant to this conversation, Officer Munkvold and three other officers, without a warrant, went to the West Quincy Street address where they knocked on defendants' door with their guns drawn. Defendants were placed under arrest and advised of their rights. The officers frisked defendants but found nothing. A search of the house, however, revealed a .32-caliber nickel plated revolver and a .25-caliber blue steel automatic in the vegetable bin inside the refrigerator. No sawed-off shotgun or money was located or recovered there. Defendants were standing in the living room approximately 10 or 12 feet away from the refrigerator in the kitchen where the weapons were found. An open doorway separated the living room from the kitchen.

At the end of the suppression hearing, the trial court found "ample evidence for probable cause to arrest." The court stated that "there was a citizen-witness who gave a knowledgeable version of the crime," corroborated by the victim. "He gave descriptions, gave the name Brenda." The trial court held, however, that the subsequent search of the refrigerator in the kitchen exceeded the area within defendants' immediate control and therefore was illegal and granted defendants' motion to suppress the two weapons.

At trial, the State presented essentially the following evidence. The victim testified that shortly after 9 a.m. on November 8, 1978, she heard a knock on the door. A woman identified herself as "Brenda." The victim unlocked her chain, opened the door a little, and saw an unknown woman and man outside the door. She immediately slammed and locked her door, but two men smashed the door and burst through the panel. The short offender, Bailey, pinned her hands against her back and held a pistol to her temple. The tall offender, Payne, ordered Bailey to "shoot her, man, shoot her," and then asked if she wanted her children to go to her funeral. Bailey forced her into a chair and put "something" over her eyes, either his hand or a blindfold. She was blindfolded for 3 or 4 minutes of the 20 minutes that the offenders were present in her house. Because the black handgun was pointing at her, she could not see much of Payne walking around to different parts of the living room. The offenders stole $75 in cash which was lying on the dresser and $2,000 in insurance proceeds. She got a good look at both offenders. Later the same day, at a police lineup of six men, she identified defendants.

On cross-examination, the victim testified that she first discovered that the $2,000 in insurance proceeds was stolen when her husband arrived home between 11 a.m. and 12 noon and he so advised her. She denied informing police that the tall offender had placed a shotgun to her head. She could clearly see the black revolver held at her head by Bailey, but this contradicted her earlier testimony at the preliminary hearing where she stated she "wasn't looking that well." She was extremely upset over the incident but not at the time of the lineup.

Claud Pearce testified that he was a janitor who lived one floor directly below the victim's apartment. At about 9 a.m. on November 8, 1978, he heard a loud racket like somebody breaking in. Upon investigation he observed that the door to the victim's apartment was "busted" open. Standing just across the hall from that apartment, he saw a tall offender exit and shout to his accomplice, "Hurry up, man let's go." He next observed a short offender emerge, lock the burglary gates closed and "take off" down the hallway. Later that same day he viewed a lineup at the police station at which time he identified defendants as the culprits.

On cross-examination, he testified that 5 to 7 minutes elapsed from the time he heard the noise until the first man emerged from the apartment; it was difficult to gauge the time as he did not have a watch. One offender was 5'6" or "something" and the other was 6'4" or "something." He saw no weapons. Defendants changed their clothes and hair styles between the time he viewed the lineup and the time the lineup was photographed. On redirect examination, Pearce testified that he identified defendants at the lineup by their faces rather than their clothing.

Officer Munkvold's testimony at trial supported his earlier testimony at defendants' suppression motion. The trial court held that the cross-examination of Officer Munkvold by defense counsel implied that no weapons were found in defendants' apartment at the time of their arrest and "opened the door" to the suppressed handguns, which were then admitted into evidence. Munkvold was then permitted to testify on redirect examination that the search of defendants' apartment revealed a blue steel revolver loaded with a clip of .25-caliber bullets. On re-cross-examination, Officer Munkvold testified that neither $2,000 nor a sawed-off shotgun was recovered pursuant to the search.

The victim was recalled and testified that the .25-caliber blue steel revolver was the same weapon that was held at her head by defendant Bailey, based upon its size and color. She "got a good look" at the weapon at the time of the incident. On cross-examination her testimony at the preliminary hearing the day after the incident was read to her where she stated, "I don't know whether it was a .32 or a .45. I wasn't looking that well." She stated that she could have made the first statement, but not the second one.

Other evidence adduced by the State was either cumulative or otherwise of little aid to the decision and need not be set forth.

Defendant Bailey took the stand and denied having robbed the victim. On the morning in question he slept in an apartment on Quincy Street until 11 or 11:30 a.m. Sometime after 12, he purchased some wine and for the first time that day he saw defendant Payne, either in a pool hall or outside. Payne was not carrying a weapon. Bailey described himself as 5'10" tall and weighing 158-160 pounds. He was not aware of a gun located in the refrigerator before the police seized it that afternoon.

The parties stipulated that if Chicago Police Officer R. Ugorek were to testify, he would state that he spoke with the victim at her apartment shortly after the incident, and that she told him a tall man put a shotgun to her head.

The jury found both defendants guilty of armed robbery, armed violence and burglary. Defendants' post-trial motions were denied and defendants were thereafter sentenced as first noted in the opinion.

I

■■ Defendants argue that their arrests were made without probable cause and therefore were illegal because they were based on hearsay information. Hearsay from an anonymous informer can be sufficient by itself to support a finding of probable cause (*People v. Williams* (1963), 27 Ill. 2d 542, 190 N.E.2d 303), provided there exists a "substantial basis" to support the credibility of the hearsay declarant (*People v. Lindner* (1975), 24 Ill. App. 3d 995, 997-98, 322 N.E.2d 229). The "substantial basis" standard is bottomed upon a two-pronged test. In the first prong, the State must show the underlying circumstances establishing the reliability or credibility of the anonymous informer and, in the second, the underlying circumstances which establish the reliability of the informer's conclusions that the defendants were engaged in criminal activity (*Aguilar v. Texas* (1964), 378 U.S. 108, 114, 12 L. Ed. 2d 723, 729, 84 S. Ct. 1509, 1514; *People v. Garcia* (1981), 94 Ill. App. 3d 940, 945, 419 N.E.2d 542) in order to demonstrate the existence of probable cause for a warrantless arrest. *People v. Saiken* (1971), 49 Ill. 2d 504, 511, 275 N.E.2d 381, *cert. denied* (1972), 405 U.S. 1066, 31 L. Ed. 2d 796, 92 S. Ct. 1499.

Defendants maintain that the State failed to establish either the reliability of the anonymous informant or any underlying circumstances upon which his conclusions were based. The State responds that the informant in the instant case was a citizen-informant, although the record is barren of any facts supporting this conclusion. Officer Benigno did not check to see whether the informant had a criminal record; whether he lived in the neighborhood of the crime or how he happened to be there. Benigno had never talked with him before or after November 8, 1978. There is thus no basis in the record upon which to invoke the citizen-informant exception recognized as credible or reliable under *People v. Hester* (1968), 39 Ill. 2d 489, 513-14, 237 N.E.2d 466.

■■ Assuming, *arguendo*, that the veracity of the informant prong of *Aguilar* had been satisfied, the basis of the knowledge prong had not. Officer Benigno was unable to provide the source of the informant's knowledge. There was no testimony whatsoever as to the few facts upon which the informant based his conclusion; or how those facts were obtained; or, if the knowledge came through some other person, who that person was and what his relationship, if any, to the crime had been. Benigno could only state the informant was not an eyewitness and that he "assumed" or got the "distinct impression" that the informant received his information from defendants themselves. Although the State argues that this branch of the test was satisfied because of the information regarding defendants' physical characteristics and the details of the crime, which were corroborated by other witnesses, Benigno never testified to any

details of those characteristics. (See *People v. Talley* (1975), 34 Ill. App. 3d 506, 509-10, 340 N.E.2d 167.) In the absence of evidence indicating the method by which the information was secured, it is particularly important that the informant describe the accuseds' criminal activities in sufficient detail so that the tribunal knows it is relying on something more substantial than a casual, circulating rumor or an accusation based merely on their general reputation. (*Spinelli v. United States* (1969), 393 U.S. 410, 416, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 588.) The description of the armed robbery which the informant revealed here lacked sufficient detail upon which to satisfy the "basis of knowledge" *Aguilar* requirement. The arrests were thus made without probable cause.

Defendants argue that the warrantless arrests of defendants in Bailey's home were illegal also because no justifiable exigent circumstances existed, relying upon *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. *Payton* held that the fourth amendment prohibited police from nonconsensual and warrantless entries into a suspect's home for purposes of effectuating an arrest absent any exigent bases. Since we hold that the arrests were illegal as having been effectuated without probable cause, no application of *Payton* principles need be made to the instant circumstances.

## II

■■ It is next maintained by the defense that all testimony concerning the identifications of defendants at the lineup and in court should be excluded as the tainted fruit of the illegal arrests. Citing *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, and *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, they assert that the lineup and in-court identifications were obtained by exploiting the primary illegality, the unlawful arrests, rather than through any independent means purged of the primary taint. Because we find the presence of independent bases for the in-court identifications of defendants, there is no necessity to consider the effect of the illegal arrests upon the lineup identifications. In *United States v. Crews* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244, the Supreme Court held that in-court identification need not be suppressed as the fruit of an unlawful arrest when the victim's independent recollections of an offender preceded the unlawful arrest and were thus untainted by a constitutional violation (445 U.S. 463, 473, 63 L. Ed. 2d 537, 547, 100 S. Ct. 1244, 1251; see also *People v. Dangerfield* (1979), 78 Ill. App. 3d 1046, 1050, 398 N.E.2d 57). Several factors must be considered in ascertaining whether there is an independent origin for an identification which *Crews*, 445 U.S. 463, 473 n.18, 63 L. Ed. 2d 537, 547 n.18, 100 S. Ct. 1244, 1251 n.18, citing *Manson v.*

*Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, described as including: (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention at that time; (3) the existence of any discrepancy between any pretrial description and the defendant's actual appearance; (4) the lapse of time between the crime and the confrontations; (5) any identification of another person prior to the lineup; and (6) the failure to identify the defendant on a prior occasion.

Applying these factors to the evidence in the record, it is apparent that the in-court identification of defendants by the victim and Claud Pearce were properly admitted into evidence. First, the victim and witness each had a clear opportunity to view the offenders at close range during and after the incident. Defendants were in the victim's apartment for approximately 20 minutes. Her vision was unobstructed for about 75% of that time. Both defendants were seen by Pearce outside the apartment as he stood across from the hallway door. Second, the victim was an interested witness. She had reason to scrutinize the faces of the offenders with some amount of care and attention. Pearce was drawn to the scene by the noise of the breakin of an apartment in a building which he served as janitor. Third, the descriptions that the victim and Pearce provided the police, as described by Officer Benigno, sufficiently conformed to the actual physical appearances of defendants Payne and Bailey. They described one intruder as male Negro, 6' tall, light skinned, 130 pounds, and 21 to 25 years of age. The arrest report indicates that on the day of the home invasion that offender was a male Negro 29 years old, 6'1", weighed 150 pounds and was of medium complexion. The other assailant was described by the victim and witness as a male Negro, 5'5" to 5'7", 125 pounds, dark complexioned, and of stocky build. The arrest report indicates that on the date of the crime he was shown as a male Negro, 5'9", 170 pounds and medium complexioned. Although the descriptions did not fit defendants' actual appearance with utter precision, discrepancies of this nature to not compel the conclusion that they lacked an independent basis for the in-court identification. Fourth, only nine or 10 hours had elapsed between the armed robbery and the victim's and witness' lineup identifications of defendants. Fifth, neither the victim nor the witness identified any other persons as the assailants at any prior time. Finally, neither failed to identify defendants on any prior occasions. From the foregoing, it must be concluded that the in-court identifications were based upon their opportunities to observe the offenders during and after the home invasion and were not the result of exploiting the illegal arrests. The identifications were based upon circumstances sufficiently distinguishable from the arrests so as to be purged of any taint resulting therefrom.

### III

■■ Defendants assign error in the admission in evidence of the gun, which had been previously suppressed. Defendants maintain that their cross-examination of Officer Munkvold could not have formed the basis for the admission in evidence of the blue steel revolver, as held by the trial court, and they were prejudiced both by the redirect testimony of Munkvold pertaining to the fruits of the search and by the admission of the gun itself into evidence. The cross-examination held to have "opened the door" to the suppressed evidence consists of the following colloquy:

"[DEFENSE COUNSEL]: Officer Munkvold, at the time of the arrest of Mr. Bailey and Mr. Payne, they were searched, were they not?

[ASSISTANT STATE'S ATTORNEY]: Objection.

[THE COURT]: Sustained

[DEFENSE COUNSEL]: Basis?

[ASSISTANT STATE'S ATTORNEY]: In fact, I'll withdraw the objection.

[THE WITNESS]: Yes, they were.

[DEFENSE COUNSEL]: Was the apartment searched?

[THE WITNESS]: Yes, it was.

[DEFENSE COUNSEL]: Thank you. That's all."

Defendants' trial counsel argued that the purpose of that particular question on cross-examination was to leave the inference that the proceeds of the burglary were not found on defendants' premises: "I have a perfect right to indicate to the jury, or make an inference that none of those proceeds were found * * * [and] that those items weren't found."

■■ A defendant cannot object if he "procures, invites or acquiesces in the admission of evidence, even though it be improper." (*People v. Burage* (1961), 23 Ill. 2d 280, 283, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651.) When a defendant implies to a jury the absence of suppressed evidence in furtherance of his defense, the State may properly introduce that evidence in contradiction of such an inference. (See, *e.g., United States v. Havens* (1980), 446 U.S. 620, 626-28, 64 L. Ed. 2d 559, 565-67, 100 S. Ct. 1912, 1916-17.) The trial court was correct in holding that defendants' cross-examination implanted improper inferences in the minds of the jurors. The jurors, upon hearing Officer Munkvold testify that a search was conducted at defendants' apartment without ascertaining the results of that search, could well have been left with the inference that no evidence was found, just as defense counsel intended.

The defense maintains, *arguendo*, that if the cross-examination of Munkvold indeed opened the door, nevertheless the problem could have been adequately resolved by utilizing less drastic means such as striking the questions and admonishing the jury to disregard them, or striking the

two general questions and allowing defendants' counsel to ask the other specific questions concerning whether a shotgun or $2,000 was found. Both of defendants' "solutions," of course, would also have served to heighten the inaccurate implications of the defendants' cross-examination. We find no error in the trial court's ruling in this regard.

## IV

It is urged by defendants that they were not proven guilty beyond a reasonable doubt because the testimony of the eyewitnesses was unclear and contradictory. Defendants' contention that the victim's in-court identification is highly unreliable is not borne out by the record. The victim's testimony, recounted previously, identifying defendants as the offenders who broke into her apartment was consistent throughout the trial, although at times her collateral testimony was contradictory and confusing. Such discrepancies in her testimony as may have appeared were insufficient to destroy her credibility.

Defense counsel also would impeach the in-court identification of the revolver by the victim's remarks at the preliminary hearing to the effect that she was uncertain of the caliber of the gun because she "wasn't looking that well." Those remarks did not destroy her testimony at trial, that "[t]o my knowledge this is the gun, or one just like it." Defendants' attack on the credibility of Pearce, claiming that he lacked an adequate opportunity to observe the intruders and that the descriptions he gave the police differ markedly from the actual physical appearances of defendants, were also previously considered and rejected above.

There was sufficient evidence in the record to support the jury's verdict of guilty. A reviewing court cannot substitute its judgment of credibility for that of the trier of fact. *People v. McLaren* (1979), 77 Ill. App. 3d 368, 372, 395 N.E.2d 1219.

## V

■■ Defendant Bailey next contends that his conviction for armed violence should be reversed because he was never charged with that offense. We concur. Count 3 names only Payne and makes no mention of Bailey within its allegations. Further examination of count 3 reveals that the word "he" was originally typed and that some unknown person at some undisclosed time added the letters "t" and "y" in handwriting to form the word "they." For all practical purposes, the word "they" contained in count 3 must be ignored. Contrary to the State's argument, the caption of the information naming both Bailey and Payne, coupled with the word "they" in count 3, fails to imply that Bailey was also charged with that particular offense. Standing alone, the caption of the information naming both Payne and Bailey cannot reasonably be construed to mean that both

defendants are charged in every count regardless of whether their names actually appear in the count.

The State maintains that defendant waived his right to raise this issue on appeal by failing to draw the trial court's attention to the information and by failing to raise the issue in his written motion for a new trial. A criminal defendant may appeal the sufficiency of the information for the first time on appeal, however. (*People v. Greene* (1968), 92 Ill. App. 2d 201, 235 N.E.2d 295. See also *People v. Pujoue* (1975), 61 Ill. 2d 335, 335 N.E.2d 437.) Bailey's conviction for armed violence must therefore be reversed.

## VI

■■ Error is next identified in that the third count of the information charging Payne with armed violence is defective because it fails to set forth the elements of the underlying felony, burglary. Conceding that count 3 refers to the felony of burglary as defined by Illinois Revised Statutes 1977, the defense insists that the reference is inadequate because the statute defines "burglary" in two different ways—unlawful entry or the act of unlawfully remaining within—either of which could constitute the offense. (Ill. Rev. Stat. 1977, ch. 38, par. 19—1(a).) Thus, it is argued, defendant Payne allegedly was forced to speculate upon which particular act, an unlawful entry or an unlawful remaining within, formed the basis of the charge.

The State responds that defendants were properly charged in count 3 because any ambiguity created in that count was remedied by a reading of the information as a whole. Count 2 alleged that defendants committed burglary in that they "without authority, knowingly entered into a building." Thus the elements of the burglary charged were articulated in the count which directly preceded the count charging armed violence based on burglary. In determining the sufficiency of a charging document, the entire complaint may be examined. (*People v. Williams* (1967), 37 Ill. 2d 521, 524-25, 229 N.E.2d 495.) The charge here was sufficient. Strict compliance with the express requirements of section 111—3(a) of the Code of Criminal Procedure (Ill. Rev. Stat. 1977, ch. 38, par. 111—3(a)) is not required when the adequacy of the information is for the first time argued on appeal. The failure to allege an element of the offense does not render it *per se* void when attacked at such time. The armed violence charge, when read in this context, sufficiently informed defendant Payne of the precise offense alleged and permitted him to prepare an adequate defense. *People v. Pujoue* (1975), 61 Ill. 2d 335, 339.

## VII

■■ Defendants contend that the burglary conviction should be reversed, since it is the lesser included offense of armed violence based on the

underlying felony of burglary, citing *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, for the following general proposition: "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act." Defendants first argue that the evidence at trial established only one physical act of burglary. The *King* mandate was violated because more than one offense, *i.e.*, burglary and armed violence, were "carved from the same physical act." Defendants rely upon *People v. Welte* (1979), 77 Ill. App. 3d 663, 396 N.E.2d 315. No discussion of this issue is set forth in *Welte*. Analytically, defendants' position cannot be sustained. As the language of section 33A—2 makes abundantly clear, *two* acts rather than just one are involved in the offense of armed violence: one being the commission of a felony, *i.e.*, burglary, and the second being armed with a dangerous weapon while committing the act. See *People v. Haron* (1981), 85 Ill. 2d 261, 278, 422 N.E.2d 627; *People v. Lynom* (1981), 97 Ill. App. 3d 1113, 423 N.E.2d 1281; *People v. Best* (1981), 97 Ill. App. 3d 1083, 424 N.E.2d 29; *People v. Feierabend* (1981), 98 Ill. App. 3d 731, 424 N.E.2d 765; *People v. Perez* (1981), 101 Ill. App. 3d 64, 427 N.E.2d 820. Contra, *People v. Simmons* (1981), 99 Ill. App. 3d 519, 425 N.E.2d 1168; *People v. Mormon* (1981), 97 Ill. App. 3d 556, 422 N.E.2d 1065, *appeal allowed* (1981), 85 Ill. 2d 562.

In the alternative, defendants contend that even if the convictions for burglary and armed violence derive from several acts, the rule enunciated in *People v. King* concerning multiple acts supports their contention that burglary is a lesser included offense of armed violence. A similar issue was raised in *People v. Lynom*, wherein the defendant there sought to have the charge of voluntary manslaughter considered a lesser included offense of the charge of armed violence. In *Lynom* (97 Ill. App. 3d 1083, 1120-21), this court considered the recently decided cases of *People v. Myers* (1981), 85 Ill. 2d 281, 422 N.E.2d 620, and *People v. Haron*, in which we noted the supreme court's conclusion that the rule it had promulgated in *King* did not preclude multiple convictions upon multiple acts and the imposition of concurrent sentences based upon them (*People v. Myers* (1981), 85 Ill. 2d 281, 288), and that if the predicate offense is a felony by statutory definition when committed without possession or use of a dangerous weapon, such an offense may support a second charge, armed violence, when committed with possession of such a weapon. *People v. Haron* (1981), 85 Ill. 2d 261, 278.

The charge of burglary in the instant case is a felony. (Ill. Rev. Stat. 1977, ch. 38, par. 19—1(b).) It may be committed without possession or use of a dangerous weapon. When defendants utilized a handgun and

sawed-off shotgun in the commission of this crime, their acts became amenable to the provisions of the armed violence statute. (Ill. Rev. Stat. 1979, ch. 38, pars. 33A—1, 33A—2.) Under these circumstances, burglary cannot be deemed a lesser included offense of armed violence since the offense of burglary requires proof of elements that are not required for the offense of armed violence. (See *People v. Myers* (1981), 85 Ill. 2d 281, 286-88; *People v. Smith* (1980), 78 Ill. 2d 298, 306, 399 N.E.2d 1289; *People v. Vriner* (1978), 74 Ill. 2d 329, 346-47, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) See also *Blockburger v. United States* (1932), 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180; *Gore v. United States* (1958), 357 U.S. 386, 2 L. Ed. 2d 1405, 78 S. Ct. 1280; *Illinois v. Vitale* (1980), 447 U.S. 410, 65 L. Ed. 2d 228, 100 S. Ct. 2260.

For the foregoing reasons, we must affirm defendants' burglary and armed robbery convictions; affirm the armed violence conviction as to defendant Payne; and reverse the armed violence conviction as to defendant Bailey.

Affirmed in part, reversed in part.

PERLIN, J., concurs.

JUSTICE DOWNING, concurring and dissenting in part:
I agree with the disposition of this case made by the majority opinion except as to part VII. I dissent from the conclusion reached therein, which holds that defendant Payne was properly convicted of both burglary and armed violence based upon the underlying felony of burglary.

A.

Defendant Payne's first argument on this issue is that his convictions for both of these offenses violate the "one act-one crime" rule of *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273. He bases this argument on his claim that he committed only one physical act which could serve as the basis for the armed violence charge. The majority opinion rejects this contention on the theory that "the language of section 33A—2 makes abundantly clear [that] *two* acts rather than just one are involved in the offense of armed violence: one being the commission of a felony * * * and *the second being armed with a dangerous weapon while committing the act.*" (First emphasis theirs, second emphasis added.)

I have carefully examined the language of section 33A—2 (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2), and cannot agree with the majority's reasoning. In my opinion, the crime of armed violence consists of only a

single criminal "act"[1] (that act being the commission of the underlying felony), which is *aggravated* by the presence of a "dangerous weapon." In enacting the armed violence statute, the General Assembly's intent (as I interpret it) was simply to provide a greater *penalty* against those defendants who chose to possess a dangerous weapon during the commission of a felonious criminal act of some type. The legislature did not, in my opinion, determine that possession of such a weapon in and of itself was a distinct criminal act to be dealt with under the armed violence provision.[2] Rather, it determined that the degree of criminality inherent in the underlying, prerequisite act (being another felony defined at law) was greater when that act was accompanied by the mere presence of a dangerous weapon.

To me, the element of the dangerous weapon contained in the armed violence provision can be analogized to the aggravated battery statute (Ill. Rev. Stat. 1977, ch. 38, par. 12—4). When a person commits a battery as defined by law (Ill. Rev. Stat. 1977, ch. 38, par. 12—3) while using a deadly weapon, he has committed aggravated battery (par. 12—4(b)(1)), an enhanced penalty crime. Yet, it cannot logically be said that that person has committed two distinct physical *King* "acts," each of which could support a different conviction without violating *King*. Instead, that person has committed a single criminal act, battery, which is aggravated by the use of a deadly weapon and becomes the crime of aggravated battery. Nevertheless, under the reasoning of the majority opinion, such a person would have committed two such acts: battery (*i.e.*, intentionally causing great bodily harm, let us say) and use of a deadly weapon, each of which could, under the majority's theory, support a *separate and concurrent* conviction. I believe that *King* would be violated in such circumstances, and similarly is violated under the majority's analysis of defendant Payne's situation.

For these reasons, I must strongly disagree with the majority's conclusion that the *King* "one act-one crime" rule was not violated here with regard to defendant Payne.

### B.

Additionally, I am convinced that the majority wrongly decided defendant Payne's alternative contention that in this case, burglary is a lesser included offense of armed violence. A corollary, in a sense, of the *King* "one act-one crime" rule is that a defendant is prejudiced where he is convicted of two offenses, one of which is by definition a lesser included

---

[1] "Act" is defined in *King* as "any overt or outward manifestation which will support a different offense." 66 Ill. 2d 551, 566.

[2] The General Assembly had already provided that certain modes of possessing certain types of weapons were illegal. See Ill. Rev. Stat. 1977, ch. 38, par. 24—1.

offense of the other. (*People v. King* (1977), 66 Ill. 2d 551, 566.) A lesser included offense is one of which all the elements are included in the greater offense (*People v. Smith* (1980), 78 Ill. 2d 298, 306, 399 N.E.2d 1289); one which is established by proof of the same or less than all of the elements of the greater offense (Ill. Rev. Stat. 1977, ch. 38, par. 2—9).

The majority concludes that burglary, as charged in the instant case, is not a lesser included offense of armed violence. I note again that the armed violence charge against defendant Payne was based upon the underlying felony of burglary, that burglary having been committed while Payne was armed with a dangerous weapon. It is obvious to me that the elements of burglary (knowingly and without authority entering and remaining in, *inter alia*, a building with the intent to commit therein a felony or theft) (Ill. Rev. Stat. 1979, ch. 38, par. 19—1), must all be proved here before Payne could be convicted of the crime of armed violence based upon that burglary. I fail to see those "elements [of burglary] that are not required for the offense of armed violence [based upon burglary]" which the majority relies upon in determining that the multiple convictions can stand. The Illinois cases cited by the majority do not, in my opinion, give any support to the majority's conclusion. In *People v. Myers* (1981), 85 Ill. 2d 281, 426 N.E.2d 535, the defendant was properly convicted of armed violence *based upon aggravated battery* and of attempted murder. As the supreme court noted, the elements of these two crimes are different. In *People v. Smith* (1980), 78 Ill. 2d 298, the defendant was properly convicted of robbery and intimidation. As the supreme court noted, these crimes have different elements, and thus intimidation could not be a lesser included offense of robbery. In *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858, the defendant was properly convicted of armed violence *based upon intimidation* and of unlawful use of weapons. As the supreme court noted, the elements of these two crimes are not the same. In contrast, here the State must prove all the elements of burglary *plus* the fact that that crime was committed while armed with a dangerous weapon in order to convict defendant Payne of armed violence. Thus, burglary is a lesser included offense of armed violence here. Consequently, Payne's conviction for burglary should be reversed. I believe the majority erred in finding to the contrary.