THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HUBERT ALMO a/k/a Herbie Almo, Defendant-Appellant.

First District (4th Division)   No. 81—44

Opinion filed April 5, 1984.

Steven Clark and Richard F. Faust, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago, for the People.

JUSTICE ROMITI delivered the opinion of the court:

On appeal of his convictions for murder and armed violence defendant Hubert Almo contends: (1) the trial court erred in granting the prosecution two extensions beyond the 120-day period in which they would have otherwise been required to bring defendant to trial; (2) defendant's guilt of murder was not established beyond a reasonable doubt; (3) defendant's armed violence conviction should be vacated because it was based on the same physical act on which his murder conviction was based; (4) the trial court erred in not permitting defense counsel to impeach a prosecution witness concerning her prior omission of a material fact from a statement made to the police; (5) when the jury initially returned verdicts of guilty of murder and voluntary manslaughter the trial court erred in submitting new verdict forms to the jury rather than entering judgment on the voluntary manslaughter verdict; (6) defendant's concurrent sentences of 30 years for murder and 20 years for armed violence were excessive; (7) assuming this court reduces defendant's murder conviction to one for voluntary manslaughter, the prosecution also failed to prove defendant's guilt on this charge; (8) a reduction of defendant's murder conviction to one for voluntary manslaughter would require vacating his armed violence conviction because both convictions arose from the same physical act and because the armed violence statute should be construed as precluding voluntary manslaughter as a proper predicate felony for armed violence.

We affirm defendant's conviction and sentence for murder but va-

cate his conviction for armed violence and the sentence imposed for that offense.

At trial Sandy Russell testified that on March 9, 1979, she was visiting her boyfriend in the second-floor lounge of the YMCA then located at 826 South Wabash in Chicago. A man subsequently identified by other witnesses as the defendant came in and stood at a table where people were playing cards. Five to ten minutes later she heard a gunshot and took cover on the floor. When she got up she saw the defendant put a gun in his holster and walk casually out the lobby as though nothing had happened. She heard no loud noises before the shooting. Russell's boyfriend testified to essentially the same facts except that he was not questioned about hearing any noises before the shooting.

Janie Boyd testified that at the time of the shooting she was in a library adjoining the second floor lounge. The victim, Rick Bynum, was sitting at a table in the lounge. Boyd heard a commotion in the lounge area and saw Bynum standing up and trying to pull the table up with him. She then heard a gunshot. Bynum ran into the library and fell to his knees. The defendant ran in behind him. With a gun in his hand the defendant stood behind Bynum and said "Get up you coward m----- f-----, get up because I ain't done anything to you yet." Bynum remained on his knees and defendant walked away. Boyd testified that she could not hear any conversation from Bynum's table before the shooting. She denied hearing defendant say anything else after the remarks she had testified about, but then admitted telling investigators that after the shooting she heard defendant yell that he had just shot someone. Boyd identified the victim as a security guard and testified that in her experience the security guards at the YMCA wore guns most of the time.

Chicago police officer Anthony Biamonte testified that he arrested the defendant as defendant walked toward the exit of the YMCA. Biamonte observed the handle of a gun sticking out of a holster clipped to defendant's belt. The gun contained five live bullets and one spent one. Another police officer who searched the victim's body in the YMCA library testified that no weapon was found on the victim.

Dr. Lee F. Beamer, a pathologist with the Medical Examiner's office, examined the victim and testified that he died of a gunshot wound to the chest which lacerated his lungs and heart. The bullet had been fired from the victim's side. According to Beamer the victim was between 25 and 30 years of age, six feet four inches tall, and weighed 213 pounds.

The defendant testified that he had lived at the YMCA since 1972 and worked there as a part-time security guard. He had previously been employed as an Andy Frain security guard in 1978 and was currently licensed to carry a gun. He was required to carry a gun while on duty as were all security guards at the YMCA.

In early 1979 Rick Bynum became a security guard at the YMCA. On March 7, 1979, Bynum approached the defendant in the YMCA cafeteria and told him to leave the premises after finishing his coffee. They argued and Bynum called the police and had defendant arrested for disorderly conduct. Defendant was released the next day and returned to the YMCA. Bynum told him he was being evicted and that although he could enter the first floor cafeteria, if Bynum caught him above the first floor he would blow his head off. Defendant testified that he was 49 years old, five feet nine inches tall, and weighed 160 pounds. Bynum was 28 years old, weighed 230 pounds, and was about six feet three inches tall.

The following evening defendant went up to the second floor where he customarily played cards. Bynum, who was sitting at a table, said, "Here, this nigger is here." Defendant told him to leave him alone and Bynum replied, "What did I tell you." Bynum told a woman sitting in front of him to move, pushed her out of her chair to the floor, and jumped up. Defendant testified that he shot once in an effort to defend himself. He then walked downstairs to the switchboard and called the police to report that he had shot someone. Defendant denied following Bynum or saying anything to him after the shooting.

Defendant testified that although he was not working as a security guard that day he was carrying a gun because he always carried one at the YMCA, having obtained permission to do so from the YMCA's chief of security. Although Bynum was not working as a security guard that day defendant testified that all the previous times he had seen Bynum, Bynum was wearing a gun. When Bynum jumped up from the table the defendant could not see his right hand. Bynum had a reputation for violence and defendant had once seen him beat a blind man suspected of breaking into a hotel room.

I

We first consider defendant's contention that the trial court erred in granting the prosecution two extensions of time beyond the 120-day period in which they would have otherwise been required to bring defendant to trial. On September 10, 1980, several days before the 120-day term was due to elapse, the prosecution filed a petition for an extension of time in order to obtain the testimony of Janie Boyd, who

they alleged was a material and necessary witness. At the hearing on the motion the prosecution presented the testimony of David Ohlson, an investigator with the Cook County State's Attorney's Office. Ohlson testified to the efforts he had made to locate Boyd since April. He had contacted the post office, the Chicago Housing Authority, the Department of Public Aid, the telephone company, and county and Federal correctional officials, all without success. A record check with the police department was unsuccessful because he did not have enough information about the witness. He also left a subpoena for Boyd's mother. Ohlson explained that the difficulty he had in locating Boyd and other witnesses was that they had all left the Wabash YMCA. In June he learned from the YMCA's central office that the former manager of the Wabash YMCA was in Des Plaines. He contacted that manager but received no additional information. He also spoke to Boyd's mother, who told him she had not seen her daughter in a long time.

Later in June, Ohlson obtained the names of three people who might have information but when he located them he did not learn anything new. In September Ohlson was told by the State's Attorney's office to drop every other case and concentrate on this one. He went back to Boyd's mother, who admitted that Boyd had been living with her. She gave him Boyd's telephone number and promised her cooperation. However Ohlson's subsequent repeated efforts to telephone the mother were unsuccessful until the day of the hearing. She then told him she had seen Boyd the day before. Ohlson testified that he was continuing to observe the mother's house.

On the basis of this information the trial court granted the prosecution a 30-day extension. At the end of that period the prosecution sought another extension in order to locate another witness, Charleston Curry. The prosecutor informed the court at the hearing on this motion that Curry had told police he had witnessed the shooting. According to the prosecutor Curry had moved out of the Wabash YMCA and had changed jobs several times. His former employers had been contacted and a check had been made at Curry's father's residence, all to no avail. However the prosecutor had been informed that Curry was training with the Marine Corps in Glenview. A sergeant there had refused to divulge Curry's address and phone number, but the prosecutor informed the court that the sergeant would be subpoenaed. The prosecution was granted another extension on the basis of these representations.

Under the provisions of the speedy trial act an extension beyond the period in which a defendant must otherwise be brought to trial

may be obtained if the court determines that the prosecution has acted diligently to obtain material evidence which there are reasonable grounds to believe may be obtained at a later date. (Ill. Rev. Stat. 1979, ch. 38, par. 103—5(c); *People v. Antrim* (1979), 67 Ill. App. 3d 1, 385 N.E.2d 5.) The determination of whether to grant such an extension is a matter for the trial court's discretion which will not be disturbed on appeal absent a showing of abuse of that discretion. *People v. Arndt* (1972), 50 Ill. 2d 390, 280 N.E.2d 230.

Defendant contends that the prosecution failed to establish the materiality of either witness or due diligence in seeking to locate them. Defendant correctly notes that no testimony was elicited at the first hearing concerning the materiality of Janie Boyd's testimony. But defendant's prior action of listing Boyd as a potential witness established that materiality for purposes of the speedy trial act. (*People v. Antrim* (1979), 67 Ill. App. 3d 1, 385 N.E.2d 5.) Certainly on the issue of due diligence the testimony of Investigator Ohlson was sufficient to establish that the prosecution had exercised diligent efforts to locate Boyd.

The materiality of Charleston Curry, who was also listed as a potential witness by the defense, was also established by the prosecutor's representation that Curry claimed to have been an eyewitness to the shooting. And again the court was informed of the specific efforts made by the prosecution to locate this witness who had moved from his last known residence and who had changed jobs several times. On the basis of the information communicated to the trial court we find no abuse of discretion in the granting of the two extensions of time.

## II

We find no merit to defendant's contention that based on the evidence the prosecution did not prove him guilty of murder beyond a reasonable doubt. The jury was not required to believe the defendant's claim that when he shot Rick Bynum he believed he had to act to defend himself. Defendant admitted that Bynum was not working as a security guard that day. He never claimed to have seen a weapon in Bynum's hand that day and no weapon was found on Bynum's body after the shooting. It is undisputed that it was the defendant who approached Bynum as Bynum was playing cards. None of the prosecution's witnesses reported hearing the statements attributed by defendant to Bynum just prior to the shooting. Janie Boyd's account of the shooting suggested that Bynum was trying to shield himself with the table when he was shot. Her account of defendant's actions immediately after the shooting was also a matter which the jury could take

into consideration in determining the credibility of defendant's account of the shooting. Under these circumstances the jury was not required to accept defendant's exculpatory version. (*People v. Lynom* (1981), 97 Ill. App. 3d 1113, 423 N.E.2d 1281.) Nor do we find the evidence of defendant's guilt of murder so improbable as to raise a reasonable doubt as to his guilt. Accordingly we will not set aside the jury's verdict on that basis. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.

### III

■ The prosecution does concede, however, that defendant's conviction for armed violence must be vacated because it was based on the same physical act upon which defendant's murder conviction was based. *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477.

### IV

■ Defendant also contends that the court erred in preventing the impeachment of Janie Boyd as to an alleged prior omission of a material fact. The alleged omission arises from a police report prepared by homicide investigator John Byrne, who testified at trial that he had interviewed Boyd after the shooting. Although that report has not been included in the record on appeal it was undisputed at trial that the report included no mention of the statement which Boyd had testified hearing defendant make to Bynum after the shooting. In a side-bar conference during the cross-examination of Boyd defense counsel stated that he intended to ask Boyd whether she told the investigator of this statement. The following colloquy then occurred:

"The Court: That would not be proper impeachment

[Defense counsel]: That is impeachment by omission, when she talked to the investigator—

[Prosecutor]: How do you impeach her from what the investigator puts in his report? It is not her report, it is a summary.

[Defense counsel]: If she said that she told him that.

[Prosecutor]: Then you have no problem.

[Defense counsel]: Then we can put him on to say that either she did—

The Court: But that is the investigator that is not here. You can't impeach her.

[Defense counsel]: All right."

Following this, defense counsel made no attempt to question Boyd concerning whether she reported the statement to the investigator, even though he was permitted to impeach her representation that she

heard him make no other statement by eliciting her admission that she had told the investigators that she heard defendant yell that he had just shot someone. Under these circumstances we do not find that defense counsel was prevented by the court from questioning Boyd about making the statement to Investigator Byrne. Defense counsel simply abandoned this line of questioning. Thus, when defense counsel subsequently attempted to cross-examine Byrne about whether Boyd ever mentioned the statement to him the trial court correctly sustained the prosecution's objection on the ground that defense counsel had failed to lay the foundation for the impeachment by first questioning Boyd about making such a statement to Byrne. (*People v. Smith* (1980), 78 Ill. 2d 298, 399 N.E.2d 1289.) Defense counsel did not contend at that time that the court had barred him from eliciting such foundation testimony, nor in his extensive motion for a new trial did he cite this ruling as a ground for reversal. Under these circumstances we find that the trial court acted properly in barring this line of questioning because of the failure to establish a proper foundation for impeachment.

## V

■ We next consider defendant's contention that when the jury initially returned verdicts finding defendant guilty of murder and voluntary manslaughter (as well as armed violence) the court should have vacated the murder verdict and entered judgment on the voluntary manslaughter verdict rather than ordering the jury to deliberate further.

After the jury had commenced its deliberations the court received the following question from the foreman of the jury:

> "Do we have to find innocent or guilty on all three charges, or are two enough?"

After consultation with both defense counsel and the prosecutor the court, with the agreement of both parties, sent a written response to the jury which in pertinent part stated:

> "If you find the defendant 'guilty' of the murder charge then you need not return a verdict on the voluntary manslaughter charge. If you find the defendant 'guilty' of the voluntary manslaughter charge then you need not return a verdict on the murder charge."

After further deliberation the jury returned guilty verdicts for murder, voluntary manslaughter, and armed violence. Over the objections of defense counsel the trial court then determined that it would submit new verdict forms to the jury for murder and voluntary man-

slaughter. The court also amended its prior instructions to the jury so as to more clearly indicate that a finding of guilty of one of those crimes precluded a guilty finding on the other. The instructions as amended stated:

> "If you find the defendant 'guilty' of the murder charge then you *must* not return a verdict on the voluntary manslaughter charge. If you find the defendant 'guilty' of the voluntary manslaughter charge then you *must* not return a verdict on the murder charge." (Emphasis added.)

The jury subsequently returned a verdict of guilty of murder.

In asserting that these actions by the trial court were erroneous the defendant relies primarily on *People v. Stuller* (1979), 71 Ill. App. 3d 118, 389 N.E.2d 593. In *Stuller* the jury returned verdicts of guilty of murder and voluntary manslaughter and the trial court vacated the voluntary manslaughter verdict and entered judgment on the murder verdict. On appeal the trial court was ordered to reduce the murder conviction to one for voluntary manslaughter. The appellate court stated that by returning a verdict of guilty of manslaughter the jury had necessarily found that the defendant had believed, albeit unreasonably, that he was justified in shooting the victim in self-defense. In so holding the court relied on its finding that a verdict of voluntary manslaughter was compelled by the evidence which established that the victim was armed, prone to violence, and had struck the defendant with a beer bottle just prior to the shooting. In the instant case we have determined that the evidence amply supported defendant's conviction for murder.

Also in *Stuller* the court noted that the jury instructions listing the elements of murder omitted the requirement that the jury find that the defendant did not believe that circumstances existed which justified his use of force. This element was included in the Illinois Pattern Jury instructions for use in a murder case in which a defendant claimed to have acted in self-defense. (Illinois Pattern Jury Instructions (IPI), Criminal, No. 27.01 (1968).) This element has been omitted in the current IPI Criminal edition. (IPI Criminal No. 27.01 (2d ed. 1981).) The *Stuller* court concluded, without referring to any other instructions in the case, that by omitting this element the trial court permitted the jury to conclude that a finding of voluntary manslaughter also supported a finding of murder. In the case at bar that element was also omitted (without objection) from the instruction listing the elements of murder. But we cannot conclude that the jury was necessarily led to believe that a finding of voluntary manslaughter would also support a finding of murder. The jury was also given an

instruction derived from IPI Criminal No. 2.01 (1968), stating that the crime of murder included the crime of voluntary manslaughter. This was technically correct, as the statute defines an included offense as one which:

"(a) Is established by proof of the same or less than all of the facts *or a less culpable mental state* (or both), than that which is required to establish the commission of the offense charged ***." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 2—9(a).)

However the instruction may well have led the jury to conclude that a finding of murder would also support a finding of voluntary manslaughter because the latter was "included" in the crime of murder. Thus when the jury returned verdicts of guilty of voluntary manslaughter and murder the court was faced with conflicting verdicts and no justifiable basis for determining which verdict should control. The court then acted in a manner which serves to completely distinguish this case from *Stuller*: it permitted the jury to clarify the ambiguity by resubmitting the verdict forms for murder and voluntary manslaughter, with instructions that defendant could only be found guilty of one of those two charges.

A jury's finding does not become a verdict until accepted by the court and entered of record. (*People v. Wilson* (1972), 51 Ill. 2d 302, 281 N.E.2d 626; *People v. Harrison* (1982), 106 Ill. App. 3d 341, 435 N.E.2d 1211.) Thus in a civil context it has been held that a trial court may properly require the jury to reconsider inconsistent findings prior to recording and discharge. (*Roth v. Meeker* (1979), 72 Ill. App. 3d 66, 389 N.E.2d 1248; *Miller v. Pillsbury Co.* (1965), 56 Ill. App. 2d 403, 206 N.E.2d 272, *aff'd on other grounds* (1965), 33 Ill. 2d 514, 211 N.E.2d 733.) Defendant has presented us with no authority suggesting that judges in criminal cases do not possess the same power to seek clarification of conflicting jury findings. Indeed, our supreme court has emphasized the importance of the trial court ascertaining whether a verdict reflects the jurors' intent, noting that upon finding that a juror did not agree with a verdict the court was authorized to require the jury to return for further deliberations. *People v. Kellogg* (1979), 77 Ill. 2d 524, 397 N.E.2d 835.

In this cause we find that the court acted properly in resubmitting verdict forms for murder and voluntary manslaughter after the jury returned inconsistent findings of guilty on both charges. We also find that the court's instructions to the jury accompanying these resubmitted forms served to clarify any confusion in the instructions. In determining whether a jury has been properly instructed on the law the in-

structions are to be read as a whole. (*People v. Kolep* (1963), 29 Ill. 2d 116, 193 N.E.2d 753; *People v. Bergeron* (1973), 10 Ill. App. 3d 762, 295 N.E.2d 228.) Thus although certain isolated instructions may have given the jury the impression that a finding of murder would support a finding of voluntary manslaughter, or vice versa, the court's instructions informing the jury that a guilty verdict on one excluded a finding of guilt on the other, coupled with the complete and accurate instructions listing the elements of voluntary manslaughter, served to fully inform the jury of the applicable law.

Defendant has also contended that the court erred in not resubmitting to the jury verdict forms on armed violence. We do not find this to have been necessary, as it was clear that the jury had concluded that defendant had committed one of the offenses forming the predicate felony for that offense. However as we have already noted, that conviction must be vacated because it was based on the same physical act as defendant's murder conviction.

## VI

■ We find no merit to defendant's contention that his sentence for murder was excessive. The sentence imposed was well within the legislative guidelines. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) The record establishes that the trial court considered the circumstances of the crime as well as defendant's lack of any criminal convictions for almost 20 years prior to the offense. We find no basis for concluding that the trial court abused its discretion and therefore will not disturb the sentence imposed. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

Because of our disposition of these issues we need not address the remainder of defendant's contentions.

Defendant's conviction and sentence for murder are affirmed. His conviction and sentence for armed violence are vacated.

LINN, P.J., and JOHNSON, J., concur.