THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NORMAN BEYAH, Defendant-Appellant.

First District (5th Division)   No. 78-411

Opinion filed May 25, 1979.

Ralph Ruebner and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of burglary (Ill. Rev. Stat. 1975, ch. 38, par. 19—1) and sentenced to a term of 5 to 15 years in the penitentiary. On appeal, he contends that (1) the trial court erred in denying his motion to suppress identification testimony, and (2) that the matter should be remanded for resentencing because in determining

sentence the trial court considered a prior conviction which was subsequently reversed.

Prior to trial defendant moved to suppress identification testimony on the ground that the identifications of defendant resulted from a photographic display which was conducive to irreparable misidentification.

The following pertinent facts were adduced at the hearing on the motion to suppress.

*For the Defendant*
*John Brines, Evergreen Park Police Officer*

On January 26, 1976, he began investigation of an alleged robbery at Holy Redeemer Church in Evergreen Park. Julia Wegner, a church employee, had reported seeing a very light complected black male in the church on January 24, 1976. She described this man as being approximately 6 feet 2 inches tall, weighing over 200 lbs, and wearing a short "afro." He was dressed in a brown jacket and checked pants. Sister Marietta, a resident of the convent, also reported seeing a black male with a close cropped "afro," beige or brown jacket and checked pants. The man she saw was carrying a valise or suitcase.

On January 26, 1976, another police officer accompanied Tom Donahue, who had also reported seeing the man in the church, Sister Marietta and Julia Wegner to the graphic arts section of the Chicago Police Department for the purpose of having a composite sketch of the suspect drawn. Between January 28, 1976, and March 5, 1976, Donahue, Wegner and Sister Marietta each viewed several hundred photographs or "mug shots" but were unable to identify a suspect.

On March 5, 1976, Secret Service Agent Axel Franzon informed him that defendant was in Federal custody. He and Officer Jerozal went to the Dirksen Federal Building in Chicago and obtained a photograph of defendant. He placed this photograph in a book with 11 photographs of different individuals. He could not recall which other photographs were placed in the book with defendant's, nor could he recall which of the other photographs were full-length, half-length or facial only. He could not recall whether the other photographs were front or side views nor whether they had identifying placards. The photograph of defendant, however, was unlike the ordinary "mug shot" in that it was a frontal view only and did not contain a placard.

On the evening of March 5, 1976, he and Jerozal brought the book to Sister Marietta and asked her to view the photographs. He did not intentionally make her aware that the photograph of a suspect was in the book. After a few minutes, Sister Marietta identified defendant as the man

she had seen near the church on January 24, 1976. She stated she was positive.

The officers also took the book of photographs to Julia Wegner's home and to the firehouse where Tom Donahue was employed. Wegner was not able to make an identification. They told Donahue that a suspect was in custody and asked him to view the photographs. When Donahue identified defendant's photograph, Brines told him he had picked the suspect. Prior to March 15, 1976, he had not shown defendant's photograph to Wegner, Donahue or Sister Marietta.

On cross-examination, he stated that he chose photographs which "fit the suspect's physical properties as close as possible" to place in the book with defendant's photograph. The other photographs could have been viewed by the witnesses prior to March 5, 1976.

*Sister Marietta*

At approximately 9:45 a.m. on January 24, 1976, she was looking out the second floor window of the Holy Redeemer Convent which is next to the church. She observed a black male walking toward her on the sidewalk between the convent and church school. It was unusual to see a black person in the predominantly white neighborhood. The man was walking with his head erect and she was able to view his face for about 30 seconds. Shortly thereafter she was told by Sister Elam to be careful because a suspicious black man had just been seen inside the rectory without permission. She did not learn, however, that a burglary had been committed until two days later.

Upon learning of the burglary, she gave Officers Jerozal and Brines a description of the man she had seen. He was "black but light complected" with short, neat hair and a good build. He was wearing a tan jacket and checked pants. On January 28, 1976, she gave a description of the man to a police artist.

At approximately 9 p.m. on March 5, 1976, Brines and Jerozal came to the convent and showed her a "photo display." She did not recall whether the officers said they had a suspect. When she observed defendant's photograph she told the officers, "This was the man that I saw walking down our sidewalk." On March 12, 1976, she viewed a lineup at the Evergreen Park police station. A police officer and a public defender were with her. She identified defendant in the lineup as the man she had seen from her convent window. She also identified defendant in court as the man she saw on January 24, 1976.

On cross-examination she stated that the police officers did not direct her attention to defendant's photograph. She recognized defendant's photograph because she had seen him from the window. She recognized defendant immediately and was positive about the identification. The

fact that the photograph did not have a placard and was only a front view did not attract her attention.

*Tom Donahue*

He is a Chicago fireman and is employed on his days off as a maintenance man at Holy Redeemer Church. At approximately 10 a.m. on January 24, 1976, he observed a suspicious man inside the church. The church was well lit and mass was to begin in about ten minutes. The man was walking on the other side of the church, approximately 30 or 35 feet from him. He observed the man's face for 10 to 12 seconds and later gave a description to the police. The man was approximately 6 feet or 6 feet 1 inch tall, weighed about 200 lbs. and had a medium "afro." He wore a brown coat and checked pants and was carrying a briefcase. After this man left the church Julia Wegner told him that a black man had been in the church office. He thought it a little strange to see a black person in the church, but was not alarmed.

On March 5, 1976, the police brought a book of photographs to the fire station. They told him that a suspect was in custody and asked him to view some photographs. He could not recall how many photographs were in the book, but there could have been as many as 50. Some photos were in color while others were in black and white. He identified defendant's photograph. Defendant's photograph did not have a placard but this did not cause it to stand out. He could not recall whether the other photographs had placards. He identified defendant in court as the man he had seen in church on January 24, 1976.

On cross-examination he stated that he was looking at the faces on the photographs rather than at whether they had placards. He did not think it unusual that there was only a front view photograph of defendant. The police officers did nothing to direct his attention to defendant's photograph. He recognized the photograph from having seen defendant in the church. On March 12, 1976, he identified defendant in a lineup. That identification was based upon the observation in church rather than on having seen defendant's photograph on March 5, 1976.

*Jack Jerozal, Evergreen Park Police Officer*

He and Brines obtained defendant's photograph from Secret Service Agent Franzon and placed it in a book with 11 other photographs. All of the photographs, including defendant's, were in color. A side-view photograph of defendant was not available on March 5, 1976.

*Julia Wegner*

She is the sacristan at Holy Redeemer Church. On March 5, 1976, Officers Brines and Jerozal showed her photographs. She was unable to make an identification. On March 12, 1976, she viewed a lineup, but was again unable to make an identification.

*Lawrence Rizzo, Evergreen Park Police Officer*

On March 12, 1976, he served an arrest warrant upon defendant who was in Federal custody. Defendant was released into his custody. Later that day he placed defendant in a lineup at the Evergreen Park police station. Defendant himself chose where to stand in the lineup. A public defender was contacted and was present during the lineup. Donahue, Wegner and Sister Marietta each viewed this lineup. Donahue and Sister Marietta each positively identified defendant; Wegner did not.

*Axel Franzon, Special Agent, United States Secret Service*

He arrested defendant on Federal charges on March 5, 1976. Shortly after the arrest, the Secret Service took a Polaroid photograph of defendant. This was standard procedure. Later that day he notified the Evergreen Police Department that defendant was in custody and that a photograph was available. Two Evergreen Park police officers arrived later to pick up the photograph.

*Norman Beyah, on his own behalf*

While he was in Federal custody on March 5, 1976, Franzon took three photographs of him, one front view and two side views. He did not see the developed photographs.

Following argument of counsel, the trial court denied the motion to suppress. At the subsequent trial both Thomas Donahue and Sister Marietta identified defendant as the man they had observed in or near the church on January 24, 1976.

OPINION

■■ Defendant first contends that the trial court erred in denying his motion to suppress identification testimony. He argues that the identifications of him by Sister Marietta and Tom Donahue were the direct result of a photographic display which was impermissibly suggestive and which gave rise to a substantial likelihood of irreparable misidentification. The United States Supreme Court has criticized photographic displays where the photograph of a single individual is in any way emphasized. (*Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) In the instant case Sister Marietta and Tom Donahue were each shown 12 photographs on March 5, 1976. Defendant's photograph was apparently the only one among those 12 photographs which had only a front view, and no additional front and side views, of the subject. It was also the only photograph which did not have an identifying placard. Defendant's was an ordinary Polaroid photograph while the others were "mug shots." We agree that the procedure utilized here tended to emphasize defendant's photograph in a suggestive manner.

■■■ However, a conviction based upon an eyewitness identification at

trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States.*) Where an improper identification procedure has been established the State must prove by clear and convincing evidence that each witness' identification of defendant was of independent origin and was not influenced by the suggestive procedure. (*People v. Ward* (1978), 63 Ill. App. 3d 864, 380 N.E.2d 883.) The identification may be admitted at trial, if, based upon the totality of the circumstances, the reliability of the identification is shown. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) In *Manion,* our supreme court stated that the following factors are relevant in determining the reliability of such an identification:

> "* * *" the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' " (67 Ill. 2d 564, 571, 367 N.E.2d 1313, 1317.)

The paramount consideration is the witness' opportunity to view the suspect. *People v. Dortch* (1978), 64 Ill. App. 3d 894, 381 N.E.2d 1193. ■ We believe the record in the instant case clearly demonstrates that both Sister Marietta and Tom Donahue had ample time and opportunity to observe defendant on January 24, 1976, and that their identification was of independent origin and not influenced by the photographic display. Sister Marietta had an unobstructed view of defendant for at least 15, and possibly 30, seconds. Defendant held his head erect so that she was able to clearly see his face. Shortly after observing defendant, Sister Marietta was warned that a suspicious black man had been seen on the premises. Donahue observed defendant for approximately 10 to 15 seconds in a well-lit church. He was 30 to 35 feet from defendant and could see defendant's face. Both witnesses stated that they were particularly aware of defendant because it was rather unusual to see a black person in the area. Neither witness expressed any hesitancy in identifying defendant's photograph. An independent basis for the identification is clearly shown by these facts. We do not believe the five week period between the initial observation on January 24, 1976, and the March 5, 1976, identification is sufficient to destroy the independent basis for the identification. In light of the independent basis for the identification, any error in the photographic display is harmless. (See *People v. Shorter* (1978), 59 Ill. App. 3d 468, 375 N.E.2d 513.) Accordingly, we find that the trial court properly denied defendant's motion to suppress the identification.

Defendant also contends that he is entitled to a new sentencing

hearing because the trial court, in determining the sentence to be imposed, considered a prior conviction which has subsequently been reversed.

Following defendant's conviction, a pre-sentence report listing various prior convictions was filed with the trial court. The report included a conviction for a 1974 burglary for which defendant received a sentence of 4 to 12 years. Both the Assistant State's Attorney and the trial court specifically referred to this prior conviction at the sentencing hearing. The trial court noted defendant's "very serious and repeated misdemeanor and felony convictions." At the conclusion of the hearing the trial court imposed a sentence of 5 to 15 years for the instant conviction. The Illinois Supreme Court subsequently set aside the conviction for the 1972 burglary and ordered defendant discharged on the basis that defendant had been denied the right to a speedy trial. *People v. Beyah* (1977), 67 Ill. 2d 423, 367 N.E.2d 1334.

■■ It is generally true that the imposition of sentence is a matter resting within the sound discretion of the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) However, our courts have held that a defendant is entitled to a reconsideration of his sentence where the trial court, in imposing sentence, considered a prior conviction which was later reversed. (*People v. Buckley* (1977), 44 Ill. App. 3d 1038, 358 N.E.2d 1327; *People v. Chellew* (1974), 20 Ill. App. 3d 963, 313 N.E.2d 284.) In *Buckley* the court noted that a reconsideration was required even where the sentence appeared to be otherwise warranted. In the instant case it is clear that in imposing sentence the trial court was aware of and considered defendant's conviction for the 1974 burglary, a conviction later reversed. Although the sentence imposed here may have been warranted in light of defendant's background of extensive criminal behaviour, we conclude that the case must be remanded for a reconsideration of the sentence. We express no opinion as to the sentence to be imposed.

For the foregoing reasons the conviction of defendant is affirmed, the sentence vacated and the case is remanded to the trial court for new sentencing hearing.

Judgment affirmed; sentence vacated; remanded for new sentencing hearing.

SULLIVAN, P. J., and MEJDA, J., concur.