THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS TAYLOR, Defendant-Appellant.

First District (5th Division)   No. 84—1572

Opinion filed November 6, 1987.

SULLIVAN, P.J., dissenting.

Daniel Wolff, of Turner & Wolff, of Chicago (Pamela Lynn Colon, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Richard A. Stevens, and James P. Stevenson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PINCHAM delivered the opinion of the court:

Following a bench trial, defendant, Thomas Taylor, was found guilty of the March 11, 1982, armed robbery of Bruce and Ken's Pharmacy and the May 29, 1982, armed robbery of Kaplan's Prescription Pharmacy. He was sentenced to two concurrent terms of six years' imprisonment in the Illinois Department of Corrections. On appeal, defendant contends that (1) the State failed to prove by clear and convincing evidence that there was an independent basis for the robbery victims' in-court identification of him as the robber, and (2) the evidence does not establish his guilt beyond a reasonable doubt.

Prior to trial Taylor presented a motion to quash his arrest and to suppress all evidence derived therefrom. At the hearing on Taylor's motion, Taylor testified that the police came to his home at about 10:30 or 11 p.m. on January 11, 1983, and told him that a six-year-old girl had picked his picture out of a mug book as being the

person who molested her and that they were taking him to the police station so that the girl could identify him. Taylor stated that the police did not show him an arrest warrant, that he was not given his *Miranda* rights, and that he did not go with the officers voluntarily.

Taylor testified that at the police station he asked to see the girl. He was then told by the arresting officer that there was no girl and that he was not at the police station for child molestation, but that he was there for armed robberies because a person named Johnny Harban, with whom Taylor was acquainted, had implicated him. The following day, after having been in custody at the police station for a day and a half, Taylor was finally placed in lineups and he was viewed by about 40 people. Although Taylor was not identified in any of the lineups by anyone, he nevertheless was charged with two separate counts of armed robbery.

The next witness called by defense counsel on the hearing of the defendant's motion to quash his arrest and suppress evidence was Chicago police detective Raymond Schalk. Schalk testified that although Taylor had not been identified as a robber by any robbery victim, he went to Taylor's home on January 14, 1982, in furtherance of his investigation of the armed robberies of drug stores which occurred March 11, 1982, and approximately June 19, 1982. Detective Schalk stated that he went to the defendant's home based upon information given him by an informant, whom he had not used on prior occasions. The informant had been involved in several offenses but the informant was not involved in the March 11, 1982, robbery of Bruce and Ken's Pharmacy or the May 29, 1982, robbery of Kaplan's Prescription Pharmacy, with which the defendant, Taylor, was charged. Schalk was not asked to and he did not identify the informant.

Detective Schalk related further that on January 13, 1983, Johnny Harban, who was in police custody, made statements to police officers regarding his armed robberies of drugstores and medical centers in which Harban named the defendant, Thomas Taylor, as Harban's accomplice in these robberies. Harban was not identified by Detective Schalk as the informant about whom he had previously testified.

Detective Schalk further related that he took the defendant from his home to the police station and that after being at the police station for approximately 10 hours, the defendant was placed in lineups.

Although Detective Schalk testified that after the lineups he sought approval from the State's Attorney to place formal charges against the defendant, there is no evidence in the record that the

defendant was identified in any lineup as a robber by any robbery victim.[1]

The trial court sustained the defendant's motion and quashed the defendant's arrest, suppressed all evidence derived therefrom, and stated:

"THE COURT: It is undisputed there were no warrants here. The defendant says he did not go voluntarily. He says he was taken to the police station ***. ***

When he was at the police station he was told for the first time that he was there on an armed robbery investigation. He was handcuffed and left in this room, put in various lineups, and viewed by about forty people. *** Detective Schalk says that they went to the defendant's home. They had no warrant. The defendant had not been identified by any victims in lineups or photographs.

\* \* \*

[The arresting officers] said he was not under arrest, that he did not refuse to go with them. They said he was free to leave. However, when he got to the police station and was warned of his rights they then arrested him without any intervening circumstances that would show that he was free to leave earlier. But now he's under arrest and he cannot leave. There has been no change in circumstances, which I find rather puzzling.

\* \* \*

There are no exigent circumstances, obviously, that would

---

[1]The dissent states, "On the day of his arrest, Ralph Herbst and Lester Jameson, who had been robbed at their pharmacies in March and May 1982, respectively, identified defendant in lineups." (163 Ill. App. 3d at 367.) There is no testimony by any witness and there is no statement by any person in the record that Herbst and Jameson identified the defendant in a lineup on the date of the defendant's arrest. Ralph Herbst did not testify that he identified the defendant in a lineup on the date of the defendant's arrest or on any other date, nor did Lester Jameson. The defendant testified at the hearing of his motion to suppress that on the day following his arrest he was viewed in lineups by approximately 40 people, but that none of them identified him. This testimony of the defendant's is uncontradicted in the record. Detective Raymond Schalk also testified at the suppression hearing that the defendant was placed in lineups after he had been in the police station for about 10 hours. Detective Schalk did not testify, however, that anyone identified the defendant as a robbery offender in those lineups. Attached as an appendix to the opinion are the record pages which refer to the lineups, which apparently are the basis for the dissent's postulation and conjecture, in the form of an unequivocal and positive statement, that Herbst and Jameson identified the defendant in lineups on the date of the defendant's arrest. I do not come to the dissent's unqualified conclusion from this record.

justify them going into a man's home without a warrant, which they did not have.

\*\*\* I cannot conclude that this defendant went willingly or that he gave them consent to enter his home \*\*\*.

\*\*\* [B]ut it seems to me they should have gotten a warrant. That's the proper thing to do.

Accordingly, I conclude as a matter of law that they lacked authority to enter the defendant's home against his will, take him down to the police station against his will, and I'll sustain the motion."

Although the State had the right to appeal the trial court's suppression order under section 114—12(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 114—12(c)), the State elected not to appeal. Instead, the State proceeded to trial.

As previously stated, there was no evidence presented on the hearing of the suppression motion, or at trial, that the defendant was identified in any lineup as a robber by any robbery victim; nevertheless, at the conclusion of the suppression hearing and immediately before the cause proceeded to trial, the following colloquy occurred:

"THE COURT: I'm suppressing the evidence.

[Assistant State's Attorney]: I understand that, all it is is an identification that we lose.

[Defense Attorney]: The only identification that has been made in this case is the lineup identification.

[Assistant State's Attorney]: That's correct.

THE COURT: Anything that follows from the illegal arrest I'm suppressing.

[Assistant State's Attorney]: We can make an in-court identification.

\* \* \*

THE COURT: \*\*\* What I'm doing is suppressing the lineup.

\* \* \*

The identification can be an in-court identification. I'm sustaining the motion and suppressing any evidence that flows from this illegal arrest. However, that does not mean the witnesses cannot testify. I'm sustaining their identification of the lineup."

The cause proceeded to trial.

Cathy Gillmeister testified that on March 11, 1982, she was employed as a cashier at the front counter at Bruce and Ken's Pharmacy located on the corner of Harlem and George in Chicago. She testified

further that at about 9:20 p.m., two white men walked into the pharmacy and that one man walked down an aisle to the back of the store while the other man stood at the front counter, pulled out a handgun and told her to stay calm and to lie down. The man opened the cash register drawers and took money. He then led Cathy to the back of the store and told her to lie down. When he could not open the cash register drawers in the pharmacy, he ordered Cathy to get up and open the drawer, which she did. The robber again told her to lie down. Cathy was not sure whether both men were the same height. She explained that she saw them for only a few seconds. She did not identify anyone as one of the robbers.

Ralph Gilbert Herbst, the pharmacist-manager of Bruce and Ken's Pharmacy, testified that at approximately 9:20 p.m. on March 11, 1982, two men entered his store. Herbst said one man walked down an aisle of the store, stepped into the pharmacy where Herbst was working, pulled out a shotgun and announced a robbery. Herbst said the man told him that he should cooperate or else he would be harmed. The pharmacy was very well-illuminated by fluorescent lights. The floor in the pharmacy area was elevated six to eight inches higher than the floor in the rest of the store. Herbst testified that the man with the shotgun was white, 30 to 35 years old, between 5 feet 9 inches and 5 feet 10 inches tall, weighed 170 to 180 pounds, and had dark blonde hair, a mustache, a drawn face, and unusual cup-shaped ears. The man was wearing a brown corduroy coat, a brown hat, dark brown pants and "very funny" brown wing-tip shoes that had been shined.

Herbst said that the man asked him where he kept his gun and that Herbst denied that he had one. The man then placed the barrel of the shotgun to Herbst's head and led him to the back room of the store where another employee, Jeff Rykal, was working. At the robber's command, Herbst instructed Rykal to return to the pharmacy with him. Both men were ordered to lie face down on the floor in the liquor department. After a few seconds the man dragged Herbst back to the pharmacy, where he saw the other armed man leading Cathy Gillmeister, a store employee, to the liquor department to join Rykal.

The man who held the shotgun demanded to know where the narcotics were that had been delivered to the pharmacy the day before. Herbst acknowledged that a shipment of drugs had been received. The man then asked Herbst where he kept the "Class A" drugs and named three drugs containing narcotics that he wanted, dilaudid, morphine and cocaine. The man and his accomplice forced Herbst to kneel and pushed him around the pharmacy as Herbst obtained the drugs

for them. One man threatened to shoot Herbst's knee off because Herbst was not finding the drugs fast enough. The two men took nearly all of the "Schedule 2" drugs in the pharmacy, Valium, approximately $1,000 in currency and coins and Illinois State Lottery tickets. They led Herbst back to the liquor department and forced him to lie on the floor next to the other two employees. The two robbers then fled through the back door of the pharmacy. Herbst estimated that the two men were in the pharmacy for 10 to 15 minutes, during which he was able to observe the face of the man with the shotgun for approximately five minutes.

When the police arrived, Herbst admitted that he described the man with the shotgun to them as 35 to 40 years old, and wearing a brown coat, brown hat, fancy brown wing-tip shoes and dark pants. Herbst went to the police station and looked at about 10 books of photographs but was unable to find the robbers' pictures. Herbst viewed a lineup on March 28, 1982, but the robbers were not in that lineup. Herbst identified the defendant in court at trial on March 30, 1984, as the man with the shotgun who robbed him two years previously, on March 11, 1982.

Ralph Herbst testified on cross-examination:

"Q. From the day of the robbery until today, as you sit on the witness stand, have you seen a photograph that appears to be the same man that was in the pharmacy?

[Assistant State's Attorney]: Objection, your Honor.

THE COURT: You may answer.

THE WITNESS: Yes.

Q. When did you see that photograph?

A. Today.

Q. And who showed you a photograph?

A. The State's Attorney."

Herbst testified further on cross-examination that the description he gave the police was that the man who held the shotgun was in his late thirties or forties, 5 feet 9 to 5 feet 10 inches tall and weighed 170 to 180 pounds. Herbst was asked to describe defendant Thomas Taylor as he appeared in court. Herbst estimated that Taylor was 5 feet 8 inches tall, weighed between 160 and 170 pounds and had a slim build.

THE MAY 29, 1982 ROBBERY OF KAPLAN'S PRESCRIPTION PHARMACY

Lester Jameson, the owner of Kaplan's Prescription Pharmacy, located at 3148 North Cicero Avenue in Chicago, testified that at approximately 5:10 p.m. on May 29, 1982, a man robbed him at gun-

point. The man entered his store, approached the back counter near the pharmacy and asked for a pack of cigarettes. Jameson went to the front of the store to get them. When he returned, the man pointed a handgun at him and ordered him to give him his wallet and to open the cash register. The man took approximately $60 from Jameson and approximately $140 from the two cash registers. Jameson described the robber as 35 to 40 years old, approximately 5 feet 9 inches tall, 160 pounds, with a light blonde mustache and a receding hairline, wearing a checkered shirt, a gray baseball jacket and blue jeans.

Jameson further testified that the robber ordered him into the back room where the prescription drugs were kept and Jameson gave the man the drugs in the narcotics drawer. The man then instructed Jameson and his employee, Tom Lehning, to lie face down on the floor and not to move for at least 15 minutes or else he would kill them. The man emptied the cash register in the back of the store and left.

Jameson estimated that the robber was in his store for approximately five minutes and that he observed the man's face "practically the whole time." When the police arrived, Jameson described the robber to them and further mentioned to the officers that the robber was balding. Jameson identified the defendant, Thomas Taylor, in court at trial as the man who robbed him.

On cross-examination, Jameson was asked to describe the defendant Taylor as he appeared in court. Jameson estimated that Taylor was "a little bit taller" than he, perhaps 5 feet 10 inches, or 5 feet 11 inches tall, and that his mustache seemed heavier in court.

James testified that on June 10, 1982, he went to the police station and viewed a lineup but did not look at photographs. He was not asked and he did not state whether he identified anyone in the lineup. The defendant had not then been arrested and he was not in that lineup. Jameson testified further on cross-examination, however:

"Q. Now, sir, between the time of the robbery and today have you seen a photograph of the individual you have identified in court today?

A. Yes.

Q. And when did you see that photograph?

A. This morning."

Lester Jameson testified on redirect examination:

"[Assistant State's Attorney]: Q. When was it that I showed you that photograph?

A. You laid some pictures down on the table, I think they

were all of five or six people lined up and I looked at it and I pointed to the defendant then and I said is this—this is the guy, isn't it and you said yes it was.

Q. And that was approximately what time this morning?

A. About 9:00 o'clock this morning, 9:30."

It was stipulated that on the date of the robberies, March 11 and May 29, 1982, the defendant was 27 years old. The State then rested. Defense counsel moved for a finding of not guilty, stating:

"Your Honor, at this time I would ask for a finding of not guilty on both charges, the basis being twofold: number one, your Honor has to determine whether there is an independent basis for the in-court identification because of your Honor's prior ruling. Your Honor, I would say inadvertently these people were shown photographs this morning of—

THE COURT: Inadvertently?

\* \* \*

[Defense Attorney]: I would just say they saw photographs, your Honor, this morning of Mr. Taylor [the defendant]. And, certainly, your Honor, that goes to what your Honor sees as an in-court identification \* \* \*."

The assistant State's Attorney argued in opposition to the defense attorney's motion for a finding of not guilty at the close of the State's case and asked that the motion be denied. The trial court responded:

"THE COURT: I have some questions for you.

[Assistant State's Attorney]: Yes, your Honor?

THE COURT: I sustained a motion to suppress here.

[Assistant State's Attorney]: Yes, your Honor.

THE COURT: Which suppressed all the evidence that flowed from the arrest.

[Assistant State's Attorney]: Yes, your Honor, you did.

THE COURT: One of the bits of evidence that flowed from the arrest was the photograph of the lineup isn't it?

[Assistant State's Attorney]: That's correct, your Honor.

THE COURT: From what the witness said you showed it to them this morning before I sustained the motion.

[Assistant State's Attorney]: Yes, your Honor. Just as an officer of the court, I was only preparing them for trial and for questions—

THE COURT: Let me ask you another question.

[Assistant State's Attorney]: Yes, your Honor?

THE COURT: Mr. Jameson said to you when you showed him the photograph this is the fella, isn't it, and you said yes.

How do you know?

[Assistant State's Attorney]: Your Honor, I never said yes—

THE COURT: All I know is what the evidence is.

* * *

I cannot add any evidence to this record. I am just saying to you Mr. Jameson said to you this is the fella, isn't it, and you said, yes. *I don't know what business it is for the State's Attorney to be telling witnesses who [is] shown in a photograph any more than I would expect the police to do that."* (Emphasis added.)

The trial court denied the defendant's motion for a finding of not guilty at the close of the State's case. The trial continued.

Taylor testified and denied that he committed either robbery. He also presented an alibi, which was corroborated by his father, his older brother, his sister and her friend. Taylor testified that he was 6 feet tall and weighed 153 pounds. The prosecutor and defense attorney stipulated that at the time of the robberies Taylor was 27 years old. Taylor admitted that he had a prior conviction for forging prescriptions for which he was placed on two years' probation.

Taylor contends on this appeal that in each of the robbery convictions the State's evidence was solely an uncorroborated single identification of the defendant, who denied commission of each offense and presented an alibi in which he was corroborated, and because the State failed to establish by clear and convincing evidence that the witnesses' in-court identifications of him as the robber were independent of the information derived from the defendant's illegal arrest, which arrest was quashed and which information was suppressed, the convictions must be reversed.

■ The State may not use that which has been derived from the defendant's unlawful arrest as evidence that the defendant committed a crime. (*People v. Glover* (1978), 64 Ill. App. 3d 662, 665, 381 N.E.2d 439.) When such evidence is suppressed, the State must show by other clear and convincing evidence that the in-court identification of the defendant was uninfluenced by and independent of the suppressed evidence. *People v. Beyah* (1979), 72 Ill. App. 3d 690, 695, 391 N.E.2d 96.

In *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, the defendant, James Wah Toy, contended that because he was illegally arrested, his arrest should have been quashed and his incriminating statement and the drugs seized arising out of his illegal arrest should have been suppressed as evidence against him on his trial for the unlawful importation of the drugs. The Supreme

Court in deciding that issue stated that the Court need not hold that all evidence is fruit of the poisonous tree simply because that evidence would not have come to light but for the illegal actions of the police. The Court held, instead, that "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 371 U.S. at 488, 9 L. Ed. 2d at 455, 83 S. Ct. at 417.

In the case at bar, as in *Wong Sun*, the defendant contended that his arrest without probable cause was constitutionally invalid. The trial court agreed and so ruled. In the case at bar the defendant testified on the hearing of his motion to quash his arrest and suppress evidence that he appeared in lineups and was viewed by "forty or so" people, but that he was not identified in the lineups as a robber by any robbery victim. The State presented no contrary evidence. The trial court ruled that the defendant's lineup, arising out of his illegal arrest, was also illegal and that any lineup identification of the defendant and "anything that follows from the illegal arrest" would be suppressed.

In the case at bar the trial court held that the defendant's lineup was constitutionally illegal because it was a derivative of the defendant's illegal arrest. In *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, the Supreme Court held that the defendant's post-indictment lineup was constitutionally illegal because it was held in the absence of the defendant's attorney and that, therefore, it should have been suppressed.

The defendant in *Wade* further urged that the victims' in-court identifications of him as the robber should likewise have been suppressed. The Supreme Court responded: "We think it follows that the proper test to be applied in these situations is that quoted in *Wong Sun v. United States* [1963], 371 U.S. 471, 488, [9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417] ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " 388 U.S. at 241, 18 L. Ed. 2d at 1165, 87 S. Ct. at 1939.

Predicated on the foregoing *Wong Sun-Wade* test, the State in the case at bar sought to establish that the robbery victims' in-court identifications of the defendant as the person who robbed them had a source independent of the defendant's illegal arrest and lineup. The Supreme Court stated in *Wade* that application of the foregoing *Wong*

*Sun-Wade* test, *i.e.*, in ascertaining whether there is an independent origin of an in-court identification, requires consideration of various factors; for example, (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention at that time; (3) any discrepancy between the victims' pretrial descriptions of the offender and the defendant's actual appearance; (4) the lapse of time between commission of the crime and the victims' identifications of the defendant as the offender; (5) any identification by the victims of another person as the offender prior to the victims' identifications of the defendant; and (6) the victims' failure to identify the defendant on a prior occasion. (*United States v. Wade* (1967), 388 U.S. 218, 241, 18 L. Ed. 2d 1149, 1165, 85 S. Ct. 1926, 1940.) A prosecutor's display of the defendant's picture to the victims and a prosecutor's identification of the defendant's lineup picture, which was suppressed as evidence, as the robber to the robbery victims immediately before trial are also factors that must be considered in determining if the victims' in-court identifications are of an independent origin.

The Bruce and Ken's Pharmacy robbery of Ralph Herbst occurred on March 11, 1982. Herbst went to the police station shortly after the robbery, looked at about 10 books of photographs but was unable to identify the robber. On March 28, 1982, Herbst viewed a lineup but he did not identify any person in the lineup as the robber. On March 28, 1982, Herbst viewed a lineup but he did not identify any person in the lineup as the robber. The defendant was arrested on January 14, 1983, 10 months after the robbery. The defendant testified that he was placed in lineups at the police station but that he was not identified in the lineups by anyone. There is no evidence in the record before us that Herbst at any time viewed a lineup which contained the defendant or that Herbst at any time identified the defendant in a lineup as a person who had robbed him.

Herbst testified and identified the defendant as the robber at trial on March 30, 1984, over two years after the robbery. The record reveals that this was the first time that Herbst had identified the defendant as the robber, more than two years after the commission of the robbery; but, more significantly, this in-court identification of the defendant was made only a few moments after Herbst had been shown the defendant's picture by the prosecuting attorney.

The defendant's picture was suppressed as evidence. The prosecutor's display of the defendant's picture to Herbst immediately before trial irreparably and irrevocably tainted Herbst's in-court identification. The crucial issue in the case was the authenticity and independence of the in-court identification. Herbst and the prosecuting attor-

ney made no effort to cleanse, nor could they cleanse, Herbst's in-court identification of the defendant as Herbst's robber from the blemish of the prosecuting attorney's display of the defendant's picture to Herbst immediately before Herbst testified.

The Kaplan Prescription Pharmacy robbery of Lester Jameson occurred on May 29, 1982. Jameson testified that on June 10, 1982, he went to the police station and viewed a lineup, but that he did not look at photographs. Jameson did not identify the defendant in that lineup as the person who had robbed him. Jameson also testified that immediately before his trial testimony on March 30, 1984, 22 months after the robbery, the prosecuting attorney showed him a lineup photograph of six persons, one of whom was the defendant. Jameson stated that he pointed at the defendant Taylor's picture and asked the prosecutor, "This is the guy, isn't it?" Jameson related that the prosecuting attorney responded, "Yes, it was."

The trial court expressed its disapproval of this identification tactic thusly: "I don't know what business it is for the State's Attorney to be telling witnesses who [is] shown in a photograph any more than I would expect the police to do that." We emphatically add our adamant disapproval of this prosecutorial trial preparation strategy.

The prosecutor knew well that the authenticity and accuracy of the robbery victims' identifications of the defendant as the robber would be the crucial issue in the case at trial. His recognition of this reality is evident from his display of the defendant's pictures to the robbery victims immediately before he called them as witnesses at trial. It is equally obvious that the robbery victims were aware that their identifications of the robber at trial were a critical issue. It is apparent that Jameson was uncertain of his identification of the defendant as the robber and he therefore sought affirmation of his uncertain identification from the prosecutor by pointing at the defendant's picture and asking the prosecutor, "This is the guy, isn't it?" The prosecutor conveniently, baselessly, and improperly confirmed, "Yes, it was." From Herbst's and Jameson's testimony of the prosecutor's display of the defendant's lineup picture to them and the prosecutor's explanation for so doing, it appears that the prosecutor may have displayed the defendant's lineup picture to Herbst and Jameson simultaneously.

The prosecutor's pretrial display to Jameson of the defendant's lineup picture, which was subsequently suppressed as evidence, instantly before Jameson's in-court identification of the defendant as the person who had robbed him 22 months previously and the prosecuting attorney's prompt substantiation and ratification of Jameson's

assertive inquiry that the defendant was Jameson's robber likewise irreversibly and irrevocably tarnished Jameson's subsequent in-court identification of the defendant. We note, as with Herbst, there was also no evidence that Jameson viewed the defendant in a lineup or that he viewed the defendant's picture at any time between the May 29, 1982, robbery and the prosecutor's display of the defendant's picture to Jameson on March 30, 1982, 22 months later. For this court to approve the in-court identifications in the instant case, where the prosecutor immediately before trial displayed the defendant's lineup picture to the robbery victims and identified the defendant as the robber and where the trial court subsequently sustained the defendant's motion to quash the defendant's arrest and suppress evidence, would constitute judicial approval of that which the prosecutor did indirectly, but was prohibited from doing directly.

The danger of misidentification of the defendant is tremendously increased where his picture has been pointed out to the victim as the robber by the prosecutor immediately before the victim's in-court identification of the defendant. The witness inherently retains in his memory when he testifies the image of the photograph, thus reducing the trustworthiness of the witness' courtroom identification.

In *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, two men entered and at gunpoint robbed a savings and loan association. On the following day, FBI agents showed the five bank employees who witnessed the robbery Simmons' picture, which the agents had acquired that morning. Each witness identified the picture of Simmons as one of the two robbers. A week or two later three of the bank employees identified pictures of Garrett as the other robber. At trial the five bank employees-witnesses identified Simmons as one of the robbers and three of them identified Garrett as the second robber. Simmons contended, for reversal of his conviction before the Supreme Court, "that his pretrial identification by means of photographs was in the circumstances so unnecessarily suggestive and conducive to misidentification as to deny him due process of law, or at least to require reversal of his conviction in the exercise of our supervisory power over the lower federal courts." Simmons "assert[ed] simply that in the circumstances the identification procedure was so unduly prejudicial as fatally to taint his conviction." (390 U.S. at 381-82, 383, 19 L. Ed. 2d at 1252, 88 S. Ct. at 970.) The Supreme Court held that Simmon's claim must be evaluated in the light of the totality of surrounding circumstances, and stated:

"It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in iden-

tifying criminals. *** Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." 390 U.S. at 383-84, 19 L. Ed. 2d at 1253, 88 S. Ct. 971.

The Supreme Court pointed out in *Simmons* that it was unwilling to prohibit the use of witnesses' picture identifications by law enforcement during the investigative and preapprehension stages of the proceedings, "as a matter of constitutional requirement." (390 U.S. at 384, 19 L. Ed. 2d at 1253, 88 S. Ct. at 971.) It is noteworthy in the case at bar that the defendant's picture identification by the robbery victims was made immediately before trial and that the picture utilized by the prosecutor and witnesses in the identification process was suppressed as evidence on fourth amendment constitutional grounds, *i.e.*, the defendant was arrested without probable cause and the picture was a derivative thereof. The Supreme Court pointed out further in *Simmons* that each case must be considered on its own facts and that a conviction based on eyewitness identification at trial following a pretrial identification by photographs will be set aside on that ground if the photograph identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. 390 U.S. at 384, 19 L. Ed. 2d at 1253, 88 S. Ct. at 971.

The Supreme Court pointed out the considerations on which it relied in upholding the picture identification in *Simmons*, which considerations are conspicuously distinguishable from the considerations in the case at bar. The Supreme Court stated in *Simmons*:

"In the first place, it is not suggested that it was unnecessary for the FBI to resort to photographic identification in this in-

stance. A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to Andrews and Simmons. It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities. The justification for this method of procedure was hardly less compelling than that which we found to justify the 'one-man lineup' in *Stovall v. Denno, supra*.

In the second place, there was in the circumstances of this case little chance that the procedure utilized led to misidentification of Simmons. The robbery took place in the afternoon in a well-lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. At least six photographs were displayed to each witness. \*\*\* Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told anything about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion.

Under these conditions, all five eyewitnesses identified Simmons as one of the robbers. \*\*\* These initial identifications were confirmed by all five witnesses in subsequent viewings of photographs and at trial, where each witness identified Simmons in person. \*\*\* Taken together, these circumstances leave little room for doubt that the identification of Simmons was correct, even though the identification procedure employed may have in some respects fallen short of the ideal. We hold that in the factual surroundings of this case the identification procedure used was not such as to deny Simmons due process of law or to call for reversal under our supervisory authority." 390 U.S. at 384-86, 19 L. Ed. 2d at 1253-54, 88 S. Ct. at 971-72.

Based upon these aforestated considerations upon which the Supreme Court relied in *Simmons* in upholding the picture and in-court identifications, and upon the contrary considerations in the case at bar, we conclude that the defendant's in-court identification was irreparably tarnished by the witnesses' pretrial picture identifications.

*United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, also holds that discrepancies between the victims' descriptions of the offender and the defendant's actual appearance are

also factors which should be considered in ascertaining whether the victims' in-court identifications are of an independent origin. Jameson's and Herbst's descriptions of the robber are inconsistent with Taylor's actual appearance.

Herbst described the man with the shotgun, supposedly the defendant, as being a white male, 35 to 40 years old, 5 feet 9 inches or 5 feet 10 inches tall, and weighing 170 to 180 pounds. Herbst said in court that Taylor appeared to be 5 feet 8 inches tall, weighing about 160 pounds and having a slim build. Herbst himself was 6 feet tall and weighed 190 pounds. Jameson described Taylor as being 35 to 40 years old, approximately 5 feet 9 inches tall, and weighing 160 pounds. Jameson testified that Taylor appeared in court "a little bit taller" than himself, perhaps 5 feet 10 inches or 5 feet 11 inches tall. The parties stipulated that Taylor was only 27 years old at the time of the robberies and Taylor testified that he was 6 feet tall and weighed 153 pounds.

Jameson and Herbst were the only witnesses who identified the defendant as being the person who robbed them. Jameson's and Herbst's in-court identifications of the defendant were irreparably stigmatized by the prosecutor's pretrial display to them of the defendant's lineup picture, which was suppressed, and by the prosecutor's affirmative answer to Jameson's inquiry as to whether the defendant was Jameson's robber; and, because the State failed to prove by clear and convincing evidence that Jameson's and Herbst's in-court identifications of the defendant as their robber were independent thereof, we reverse the defendant's conviction and remand for a new trial.

The defendant further contends for reversal that the evidence failed to establish his guilt beyond a reasonable doubt. A review of the evidence presented at trial reveals that it was sufficient for the fact finder to conclude that it established the defendant's guilt beyond a reasonable doubt. We do not thereby determine defendant's guilt or innocence to be controlling on retrial. We simply consider the sufficiency of the evidence presented at defendant's trial with regard to *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366, to avoid subjecting the defendant to double jeopardy.

Reversed and remanded.

LORENZ, J., concurs.

APPENDIX

Record 28-29:

"Chicago Police Department Detective Robert Schalk, called as a witness on behalf of the defendant on the hearing of the defendant's motion to suppress, testified on cross-examination by the prosecutor:

Q. And on January 14, 1983, were line-ups conducted?

A. Yes, they were.

Q. Were they conducted by yourself and your partner?

A. Yes. That's right.

Q. And after those line-ups that's when you called for the State's Attorney?

A. That's correct.

Q. And after the line-ups that's when Thomas Taylor was formally charged by the State's Attorney's Office?

A. That's right."

Record 57-58:

"THE COURT: *** Accordingly, I conclude as a matter of law that they lacked authority to enter the defendant's home against his will, take him down to the police station against his will, and I'll sustain the motion. What date do you want, Mr. Weigand?

[Assistant State's Attorney]: We're ready to proceed to trial. The only thing we lose in this motion—

THE COURT: I'm suppressing the evidence.

[Assistant State's Attorney]: I understand that. All it is is an identification that we lose.

[Defense Attorney]: The only identification that has ever been made in this case is the line-up identification.

[Assistant State's Attorney]: We can make an in-court identification.

[Defense Attorney]: The in-court identification will be based upon the arrest.

[Assistant State's Attorney]: That's not necessarily true, your Honor. If, in fact, the witnesses here had an opportunity to observe the defendant prior to and during the Armed Robbery—

THE COURT: Had an opportunity when? After the arrest?

[Assistant State's Attorney]: During the Armed Robbery itself, and they are able to identify an individual based upon that, they can identify him in open court as long as they had an opportunity.

THE COURT: I don't think that would have—perhaps

you're right. What I'm doing is suppressing the line-up.

[Assistant State's Attorney]: That's correct.

[Defense Attorney]: And the identifications, your Honor.

THE COURT: The identification can be an in-court identification. I'm sustaining the motion and suppressing any evidence that flows from this illegal arrest. However, that does not mean the witnesses cannot testify. I'm sustaining their identification of the line-up."

Record 210-12:

"THE COURT: Let me ask you this: *Does the record show when Mr. Herbst and Mr. Jameson saw the defendant after March and May of 1982?*

[Assistant State's Attorney]: *No, it does not show.*

THE COURT: *When do [sic] they next see him?*

[Assistant State's Attorney]: They next saw him, your Honor—

THE COURT: Today?

[Assistant State's Attorney]: No, your Honor, not today.

THE COURT: When?

[Assistant State's Attorney]: *The next time they saw him was on January 14, 1983 at about 10:00 o'clock in the evening.*

THE COURT: *Where? Is that in the evidence?*

[Assistant State's Attorney]: *That's not in the evidence.*

THE COURT: I'm asking about the evidence. *So far as the evidence shows these witnesses never saw this defendant until today. That's over two years ago, right?*

[Assistant State's Attorney]: *That's correct.* And, your Honor, one last thing I will point out just to refresh you, although the trial has not been long, *Ralph Herbst went into the police station and looked at a line-up and told you he did not identify anyone there.* He's just not picking someone else because he thinks this is the guy, so he's just going to put his finger there. He's done some work on this, going into the police stations and looking at photographs and line-ups.

THE COURT: Mr. Wolff.

[Defense Attorney]: Your Honor, take the length of time between the length of time of the evidence and the time any identification was made, take the totality of the circumstances, your Honor. We're talking about proof beyond a reasonable doubt. Your Honor heard all the evidence. There is no proof beyond a reasonable doubt in this case.

THE COURT: What about the identification here? There

was ample opportunity.

[Defense Attorney]: Your Honor, people honestly make mistakes. Had the identification taken place the next day, the next week, it would be a little different, but here we have one that takes place, and it is not in the evidence, your Honor, some six months later, some eight months later. Today, before they take the witness stand they are shown photographs. \*\*\*" (Emphasis added.)

Record 239-41:

## "MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE

Petitioner, THOMAS TAYLOR, the defendant in the above-entitled cause, moves this Honorable Court to quash his arrest and suppress from introduction into evidence the direct and indirect products of said arrest, to wit: a line-up identification which resulted from that arrest.

In support whereof, petitioner states:

1. On or about January 14, 1983, petitioner was arrested at or near 1525 N. Artesian, Chicago, Illinois.

2. The arrest was a seizure as contemplated by the Fourth Amendment to the United States Constitution.

3. The Fourth Amendment of the United States Constitution guarantees the right of persons to be secure from unreasonable search of their persons, houses, papers and effects.

4. The exclusionary Rule prohibits the introduction into evidence of the direct and indirect products of unreasonable searches and seizures, said Rule enunciated in *Mapp v. Ohio*, 357 U.S. 643.

5. The arrest of petitioner was made without authority of a valid arrest warrant.

6. The conduct of petitioner prior to his arrest was such as would not reasonably be interpreted by the arresting officers as constituting probable cause that petitioner had committed or was about to commit a crime.

7. Subsequent to petitioner's arrest he was searched, photographed, fingerprinted and otherwise processed, questioned and exhibited by the police in several line-ups.

8. During the arrest and subsequent detention, the police and prosecution became aware of the existence of physical evidence, witnesses, and other evidence all the direct and indirect fruits of the arrest and detention, which connect petitioner with a crime.

9. The exhibition of petitioner caused the prosecution to become aware of witnesses which the State intends to call to testify against petitioner in this case.

10. As a result of the arrest, the prosecution has acquired knowledge that it intends to employ in the prosecution of this cause.

WHEREFORE, petitioner respectfully moves this Honorable Court to quash his arrest, because of the absence of authority or probable cause to effect it, and to suppress from introduction into evidence in this cause, the following:

A. Physical evidence discovered directly and indirectly as a result of the arrest and detention.

B. Witnesses who viewed petitioner during the detention following the arrest, as well as witnesses discovered as a result of the arrest.

C. Photographs, fingerprints, and other information, the product of the processing of petitioner following his arrest, and the fruits thereof.

D. All other knowledge and the fruits thereof, witnesses, statements, whether written, oral or gestural, and physical evidence which is the direct and indirect product of the arrest.

/S/   Thomas L. Taylor
Petitioner-Defendant


STATE OF ILLINOIS  )
                ) SS
COUNTY OF COOK   )


I, Thomas Taylor, being first duly sworn on oath, depose and state that I have read the foregoing Petition by me subscribed, that I know the contents thereof, and that same is true in substance and in fact.

/S/   Thomas L. Taylor
Petitioner-Defendant

Subscribed and Sworn to
before me this 30th day of
March, 1984.


/S/   Henry W. Lodawski, Clerk"


Record 255-56:

## "MOTION FOR A NEW TRIAL

NOW COMES the defendant, THOMAS TAYLOR, through his attorneys, TURNER & WOLFF, and moves this Honorable Court to grant him a new trial for the following reasons:

1. A pretrial Motion to Quash the defendant's arrest and suppress all evidence flowing from that arrest was heard and sustained.

2. As a result of that arrest, the defendant was placed in numerous line-ups and was identified by the only two (2) witnesses the prosecution relied upon to obtain the conviction in the above case.

3. These witnesses would not have come to the attention of the prosecution other than as a result of the unlawful arrest.

4. In that the defendant was only in court as the result of the arrest and the witnesses became known to the prosecution as a result of the arrest, an in-court identification should not have been permitted.

5. The defendant was not proven guilty beyond a reasonable doubt.

Respectfully Submitted,

/S/  DANIEL WOLFF
Attorney for Defendant"

PRESIDING JUSTICE SULLIVAN, dissenting:

I respectfully dissent. In my judgment, the State proved by clear and convincing evidence that there was an independent basis for the eyewitnesses' in-court identifications of defendant.

In January 1983, defendant was arrested in his home without a warrant for a series of armed robberies of pharmacies on the northwest side of Chicago. On the day of his arrest, Ralph Herbst and Lester Jameson, who had been robbed at their pharmacies in March and May 1982, respectively, identified defendant in lineups.[2] Defendant moved to quash his arrest and suppress the evidence derived therefrom. Following a pretrial hearing, the court granted defendant's motion, whereupon it became incumbent upon the State to prove by clear and convincing evidence that there was an independent basis for the eyewitnesses' in-court identifications.

An in-court identification need not be suppressed as the fruit of an unlawful arrest when the witness' independent recollections of an

---

[2]Although the majority opinion correctly notes that there was no testimony that either witness identified defendant in a lineup, an examination of the excerpts from the record appended to that opinion leaves no doubt that they did. Investigator Schalk testified that defendant was charged with the pharmacy robberies after he was viewed in lineups held on January 14, 1983, the date of his arrest. In his motion for a new trial, defendant stated that "[he] was placed in numerous line-ups and was identified by the only two (2) witnesses the prosecution relied upon to obtain the conviction in the above case." Those two witnesses were Ralph Herbst and Lester Jameson. The majority's refusal to acknowledge the obvious, that the witnesses had to have identified defendant before trial, is inexplicable. Why would defense counsel move to quash defendant's arrest, including lineup identifications, unless such identifications had been made?

offender preceded the unlawful arrest and thus were untainted by a constitutional violation. (*United States v. Crews* (1980), 445 U.S. 463, 473, 63 L. Ed. 2d 537, 547, 100 S. Ct. 1244, 1251.) In ascertaining whether there is an independent origin for an in-court identification, a court should consider several factors, including: (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness' degree of attention at that time; (3) the existence of any discrepancy between any pretrial description and the defendant's actual appearance; (4) the lapse of time between the crime and the confrontations; (5) any identification of another person prior to the identification of the defendant; and (6) the failure to identify the defendant on a prior occasion. 445 U.S. at 473 n.18, 63 L. Ed. 2d at 547 n.18, 100 S. Ct. at 1251 n.18.

Applying these factors to the evidence in the record, it appears that the in-court identifications of defendant by both armed robbery victims were properly admitted into evidence. First, each victim had an excellent opportunity to view the offender at close range for five minutes. Second, each eyewitness carefully observed the offender's face during the robbery. Third, the descriptions that both victims provided to the police sufficiently conformed to the defendant's actual appearance.

Herbst described the offender with the shotgun as a white male, 30 to 35 years old, between 5 feet 9 inches and 5 feet 10 inches tall, weighing 170 to 180 pounds, with a blonde mustache, unusual cup-shaped ears and a drawn face. Herbst testified that in court defendant appeared to be 5 feet 8 inches tall, 170 to 180 pounds and slim. Jameson described the offender as a white male, 35 to 40 years old, approximately 5 feet 9 inches tall, weighing 160 pounds, with a light blonde mustache and a receding hairline. Jameson stated that in court defendant appeared to be "a little bit taller" than he, perhaps 5 feet 10 inches to 5 feet 11 inches tall, and that his mustache seemed to be heavier. The parties stipulated that defendant was 27 years old at the time of the robberies, and defendant testified that he was about 6 feet tall and weighed 153 pounds.

Although the witnesses' descriptions of the offender did not perfectly match defendant's actual appearance, the discrepancies in their descriptions do not compel the conclusion that they lacked an independent basis for their in-court identifications. (See *People v. Payne* (1981), 102 Ill. App. 3d 950, 958, 429 N.E.2d 1344, *aff'd in part and rev'd in part on other grounds* (1983), 98 Ill. 2d 45, 456 N.E.2d 44 (where the descriptions of two offenders included discrepancies of four to eight years in age, two to four inches in height and 45 pounds

in weight).) We note that because of his receding hairline defendant may have looked older than he was. Moreover, defendant may have weighed more in 1982 than when he was tried in 1984. Furthermore, both witnesses accurately described his blonde mustache and Herbst noticed his unusual cup-shaped ears and drawn face.

In denying defendant's motion to suppress the witnesses' in-court identifications, the very able trial judge found that the descriptions of defendant were "very accurate" and contained only insignificant differences in age, height and weight. In finding defendant guilty, he stated that the witnesses' identifications of the offender were "substantially identical" and closely corresponded to defendant's appearance in court.

However, in attempting to demonstrate that there was no independent basis for the in-court identifications of the defendant, the majority focuses on the fact that the prosecutor showed the lineup photographs to Herbst and Jameson "immediately before" trial. The opinion suggests that the photographs were shown to them *after* the court had granted defendant's motion to quash and suppress. The record indicates otherwise. The witnesses viewed the lineup photographs "for a few seconds" on the morning of the day on which trial commenced, *before* defendant's motion was heard and granted. There is nothing improper in the prosecutor's reviewing this evidence at that time with his witnesses.

I agree with the majority that the prosecutor should not have confirmed Lester Jameson's identification of defendant's lineup photographs prior to trial.[3] Notwithstanding this conduct, which the trial court criticized, the trial court found that there was an independent basis for Jameson's in-court identification of defendant. I believe that this finding is amply supported by the record.

Fourth, while there was a substantial lapse of time between the commission of the crimes and the out-of-court identifications of defendant (10 months in the case of one robbery and 7½ months in the other), similar intervals have not been deemed to be fatal to an in-court identification. See *People v. Philson* (1979), 71 Ill. App. 3d 513, 516-18, 389 N.E.2d 1223 (where there was a 14-month delay between the date of the crime and the date on which the eyewitnesses identified defendant in photographs of a lineup).

Fifth and sixth, there is no evidence in this record that either victim identified any other person as the offender and neither victim failed to identify defendant on any prior occasion.

---

[3]It is noted that there was no such confirmation of Herbst's identification.

370

From the foregoing, I agree with the trial court that the eyewitnesses' in-court identifications of defendant were based upon their opportunity to observe the offender during the robberies and were not the result of exploiting defendant's illegal arrest. The identifications were based upon circumstances sufficiently distinguishable from the arrest so as to be purged of any taint resulting therefrom. Accordingly, I dissent from the decision to remand this cause for a new trial. I concur, however, in the majority's finding that defendant was proved guilty beyond a reasonable doubt.